1  **DLA PIPER LLP (US)**
   Kathleen S. Kizer
2  kathleen.kizer@dlapiper.com
   555 Mission Street, Suite 2400
3  San Francisco, CA  94105-2933
   Telephone:     415.836.2500
4  Facsimile:     415.836.2501

5  **DLA PIPER LLP (US)**
   (Pending applications *pro hac vice*)
6  Edward Scheideman
   edward.scheideman@dlapiper.com
7  Victoria A. Bruno
   victoria.bruno@dlapiper.com
8  500 Eighth Street, NW
   Washington, D.C. 20004
9  Telephone:     202.799.4000
   Facsimile:     202.799.5000
10
   Attorneys for Plaintiff
11 PRIME HEALTHCARE SERVICES, INC.

12

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                 SAN FRANCISCO DIVISION

16

17 PRIME HEALTHCARE SERVICES,          CASE NO.   3:14-cv-3831
   INC.,
18                                     **COMPLAINT FOR DAMAGES FOR
                  Plaintiff,           RACKETEERING, CONSPIRACY TO
19                                     ENGAGE IN RACKETEERING, AND
   v.                                  RELATED CLAIMS**
20
   SERVICE EMPLOYEES                   **RACKETEERING INFLUENCED AND
21 INTERNATIONAL UNION; SERVICE        CORRUPT ORGANIZATIONS ACT
   EMPLOYEES INTERNATIONAL             (RICO), 18 U.S.C. §§ 1961 *et seq.***
22 UNION – UNITED HEALTHCARE
   WORKERS WEST; CHANGE TO WIN;        **JURY DEMANDED**
23 CTW INVESTMENT GROUP; MARY
   KAY HENRY; DAVE REGAN; and TOM
24 WOODRUFF,

25                Defendants.

26

27

28

DLA PIPER LLP (US)
SAN FRANCISCO

1

## TABLE OF CONTENTS

2

**Page**

3   NATURE OF THE ACTION ............................................................................................. 1

THE PARTIES ................................................................................................................ 5
4
I.      The Plaintiff .................................................................................................. 5
5
II.     The Defendants ............................................................................................. 6
6
JURISDICTION AND VENUE ................................................................................... 10
7
ALLEGATIONS ........................................................................................................... 11
8   I.      Defendants Use Corporate Campaigns as a Way of Conducting Business ..... 11

A.     A Corporate Campaign:  The Death of a Thousand Cuts ................... 11
9
B.     SEIU's Playbook For Extortionate Campaigns ................................... 19
10
C.     Defendants As Social Activists ........................................................... 24

II.     The Formation of the Conspiracy ............................................................... 24
11
A.     Defendants Need To Eliminate Non-Union Threats In Order To Survive. .......... 24
12
B.     Protecting Their Interests Through Extortionate Campaigns Is Defendants' Regular Way of Doing Business ................................... 26
13
III.    Defendants' Unlawful Scheme to Extort Prime .......................................... 27
14
A.     Prime as a Threat ................................................................................ 27
15
B.     Defendants Have a Direct Financial Motive to Extort Prime ............. 29

C.     Defendants Are Attempting to Obtain Prime's Property .................... 30
16
IV.    The Conspiracy Targets Prime ................................................................... 33
17
A.     Defendants Have Threatened Prime And Admitted That The Campaign Would Cease Only And Unless Prime Surrenders To Defendants' Demands ...... 34
18
B.     Defendants Attack Prime's Affiliates ................................................. 36
19
C.     Defendants Publish False and Disparaging "Studies" Attacking Prime and Rely On Those "Studies" to Advance Their Campaign ....................... 38
20
D.     Defendants Interfere with the Growth of Prime's Business ................ 41
21
E.     Defendants Manipulate the Media ...................................................... 48

F.     Defendants' Sham Lobbying and Litigation ....................................... 49
22
G.     Defendants Coordinate Pressure To Have Prime's Awards Rescinded. .............. 53
23
H.     Defendants Affirm Their Campaign Against Prime By Pressuring The California Hospital Association ..................................................... 54
24
V.     Impact of Defendants' Conduct on Prime ................................................... 58
25
SPECIFIC COUNTS .................................................................................................... 60

26

27

28

1

## **NATURE OF THE ACTION**

2       1.      Plaintiff Prime Healthcare Services, Inc. is a California-based progressive,

3   innovative, and expanding hospital management company.  Prime Healthcare Services, together

4   with the affiliated but separate non-profit Prime Healthcare Foundation, own and/or operate 28

5   acute care hospitals in California, Kansas, Michigan, Nevada, New Jersey, Pennsylvania, Rhode

6   Island, and Texas through their respective subsidiaries.   Prime's mission is to provide

7   comprehensive, quality healthcare in a compassionate, convenient, and cost-effective manner.

8   Prime has been successful in acquiring failing and near-bankrupt hospitals with poor ratings and

9   quickly transforming them into top-rated facilities.

10      2.      Because of the high quality of its services and operational excellence, Prime is a

11  nationally recognized, award-winning health system.  Prime has been rated as one of the "Top 15

12  Health Systems" in the nation by Truven Health Analytics (formerly Thomson Reuters) three

13  times in the past five years – 2009, 2012, and 2013 – based on the quality of its healthcare and

14  patient satisfaction.  Truven also rated eight Prime Hospitals as "100 Top Hospitals" in the nation

15  in 2014; eight of the ten California community hospitals that earned this distinction were Prime

16  hospitals.  Prime hospitals have been rated as "100 Top Hospitals" twenty-seven times since

17  2003.   Also, in 2013, eleven Prime hospitals across four states were recognized as "Top

18  Performers on Key Quality Measures" by The Joint Commission, an independent, not-for-profit

19  organization that is the leading accreditor of healthcare organizations in the nation.

20      3.      Prime's position as a largely non-union competitive alternative to hospitals

21  organized by Defendants threatens Defendants' dual objectives of (a) maintaining and expanding

22  their own representation of healthcare workers, and therefore, maintaining and increasing monies

23  paid into Defendants' own coffers, and (b) increasing labor costs and inefficiencies at hospitals,

24  like Prime, that compete with unionized healthcare providers.

25      4.      As a result, Defendants entered into an agreement and conspired to target and to

26  attack Prime with the ultimate objective of either unionizing Prime, thereby altering its cost

27  structure and business model, or eliminating Prime from the market altogether; either result

28  benefits Defendants.   Defendants have previously targeted and attacked numerous hospital

operators that posed a similar threat, including Columbia/HCA, Tenet Healthcare Corporation ("Tenet"), and Catholic Healthcare West ("CHW") (now Dignity Health), each of which eventually capitulated to Defendants' unlawful and extortionate attacks.

5.     This case is not about the well-recognized right of employees to engage in collective action and form or join a union. Rather, it is about several labor organizations and their executives abandoning the traditional legal framework for organizing employees and, instead, entering into a conspiracy to adopt and to implement strong-armed, extortionate tactics to get what they want. While Defendants' methods are wide-ranging and elaborate, their purpose is straightforward: Defendants have met with and told Prime that if it does not turn over the non-union healthcare workers at its hospitals on terms dictated by Defendants, they will destroy Prime and ruin the lives of its executives.

6.     To make good on their threats, Defendants have embarked on a campaign of extortionate assaults on virtually every aspect of Prime's business. Through their attacks, Defendants seek to decimate Prime's relationships with its patients, business partners, and future business partners and destroy the very core of Prime's business, offering to stop these activities only and until Prime "surrenders" to Defendants' forced unionization demands. All the while, Defendants have enriched, and seek to further enrich, themselves at the expense of Prime by obtaining Prime's property. Defendants' conduct is textbook extortion.

7.     At the core of the conspiracy is an agreement by the Defendants to eschew traditional organizing and wage their war on Prime through the use of a so-called "corporate campaign." A corporate campaign is designed to avoid altogether the federal legislative scheme for organizing employees into labor unions that has been in place for over seventy years. Instead, Defendants – under the guise of "social activism" – have extorted Prime and attempted to force Prime to surrender its property in the form of protected legal rights to which Defendants have no entitlement or claim through a relentless and vicious assault designed to smear Prime with countless public attacks, embarrass and intimidate Prime's managers and executives, and compel Prime's current and prospective customers to terminate their business affairs with Prime.

8.     Defendants have engaged in a pattern and practice of overt extortionate acts and

other unlawful activity designed to both damage Prime's business and enrich the conspirators by, for example:

- attempting to thwart Prime's acquisition of additional hospitals;

- attacking investment partners of Prime through false and disparaging public accusations of wrongdoing;

- producing false and misleading reports and studies for the sole purpose of damaging Prime's business reputation and goodwill;

- working with complicit media outlets to publicize sham and baseless allegations;

- initiating certain sham and baseless complaints causing regulatory and administrative investigations, sham and baseless litigation, and inquiries by accreditation agencies;

- coercing and threatening patients who use Prime's services;

- persuading writers, government agencies, and politicians to raise specious allegations about Prime's conduct;

- targeting the California Hospital Association ("CHA") with sham ballot initiatives to impose a top-down neutrality agreement on its members (including Prime);

- undertaking various other activities including, by way of limited example, declaring publicly that Defendants will continue to "beat up" Prime unless and until it "heels" to their demands;

- funding the campaign against Prime with "laundered" money unlawfully received in violation of federal law; and

- engaging in the above activities through interstate travel or the use of interstate facilities with the intent to further the campaign against Prime in violation of federal law.

Defendants have undertaken and continue these actions in order to diminish Prime's revenues and raise Prime's costs – enriching Defendants during the process – with the ultimate goal of either eliminating Prime as a competitor in the market or forcing Prime to concede to the campaign and unionize.

9. Defendants have developed and honed their corporate campaign tactics over many years. In fact, SEIU wrote and published (and has re-written and re-published) its own corporate campaign playbook. SEIU's Contract Campaign Manual ("the Manual") describes in detail Defendants' preferred tactics for harassing, intimidating, smearing, and psychologically and financially punishing employers that are unwilling to yield to their extortionate demands.

10. The Manual openly acknowledges that Defendants' corporate campaign tactics can constitute extortion or blackmail and suggests creative strategies for diverting the blame for a union's malicious campaign attacks to third parties, often under the banner of "social activism." The Manual notes that:

> [i]t may be a violation of blackmail and extortion laws to threaten management officials with release of 'dirt' about them if they don't settle a contract. But there is no law against union members who are angry at their employer deciding to uncover and publicize factual information about individual managers.

(Manual at 3-27). Defendants entered into an agreement and conspired to utilize the tactics in the Manual in its campaign against Prime. In attacking Prime as described herein, Defendants have followed SEIU's extortion playbook to the letter.

11. That extorting and forcing the unionization of Prime or, alternatively, destroying it altogether are Defendants' goals is self-evident from their own statements and admissions. As part of the conspiracy, by way of example, it was agreed that Defendants would threaten and have threatened to expose alleged "dirt" on Prime, to put Prime's founder and Chairman, President, and current Chief Executive Officer, Prem Reddy, MD, FACC, FCCP (Dr. Reddy"), and its former Chief Executive Officer, Lex Reddy, in jail, to block all of Prime's attempts at further hospital acquisitions, to publicly "beat up" Prime, to create sham opposition from state and federal governmental officials and legislators, and to stop their extortionate campaign only if Prime surrenders to Defendants' demands.

12. As Defendants originally threatened, and as their continued extortionate statements and acts have shown, Defendants' vicious corporate campaign is designed to and will not stop until it either destroys Prime and its business or Prime capitulates and cedes control of its workforce and other property to Defendants. Defendants profit from either result: Prime is eliminated from the market entirely or it is equally burdened with the same labor costs and inefficiencies as union-dominated healthcare providers and Defendants' coffers remain full and, in fact, expand (i.e., if Prime surrenders, Defendants receive millions of dollars of Prime's money from new dues paying members; if Prime is eradicated, Defendants continue to receive dues from its members at the unionized hospitals that can survive only without competition; and, during the

campaign, Defendants continue to profit from the acquisition of Prime's goodwill and customers). Defendants also profit if Prime succumbs to the pressure of the campaign from Prime's resulting surrender of control of its business affairs and goodwill to Defendants.

13. Prime has expended enormous efforts to prevent Defendants from obtaining its property through their extortionate campaign. The property that Defendants are attempting to obtain from Prime includes, by way of example:

- Prime's goodwill that it has spent many years and millions of dollars creating in the markets in which it does business;

- Prime's right to engage in and grow its business through hospital acquisitions;

- Prime's relinquishment of substantial autonomy and control over its business operations to Defendants;

- Prime's right not to recognize SEIU and/or its affiliated locals including, but not limited to, UHW, as bargaining agent of Prime's non-union employees;

- Prime's agreement to allow SEIU and/or its affiliated locals including, but not limited to, UHW, to exercise for Prime its right to insist on secret-ballots elections conducted by the National Labor Relations Board ("NLRB"), to voice its opinion or opposition to attempts to unionize its employees, and to exclude representatives of same from Prime's premises;

- Prime's money in the form of pension fund contributions and union dues paid to Defendants on behalf of Prime's employees; and

- Prime's customers and related revenues.

14. Prime brings this action to protect that property and vindicate its right to control and operate its business affairs free from Defendants' campaign of intimidation, threats, and other extortionate conduct. Prime seeks to recover damages, including treble damages, and attorney's fees and costs for Defendants' violations of Sections 18 U.S.C. §§ 1962(a), (b), (c), and (d) and any other damages this Court may deem appropriate.

## PARTIES

### I. The Plaintiff

15. Plaintiff Prime Healthcare Services, Inc. is a Delaware corporation, with its principal place of business located at 3300 East Guasti Road, Ontario, California 91761. Prime Healthcare Services is the sole shareholder or member of corporations or limited liability companies that own and/or operate 22 hospitals: eleven in California (Alvarado Hospital Medical

1  Center, Centinela Hospital Medical Center, Chino Valley Medical Center, Desert Valley Hospital,

2  Garden Grove Hospital Medical Center, Glendora Community Hospital, La Palma

3  Intercommunity Hospital, Paradise Valley Hospital, San Dimas Community Hospital, Shasta

4  Regional Medical Center, and West Anaheim Medical Center); two in Kansas (Providence

5  Medical Center and Saint John Hospital); one in Michigan (Garden City Hospital); one in Nevada

6  (Saint Mary's Regional Medical Center); one in New Jersey (Saint Mary's Medical Center); two

7  in Pennsylvania (Lower Bucks Hospital and Roxborough Memorial Hospital); two in Rhode

8  Island (Landmark Medical Center and Rehabilitation Hospital of Rhode Island); and two in Texas

9  (Dallas Medical Center and Harlingen Medical Center).

10       16.    The other six Prime hospitals are owned and/or operated by Prime Healthcare

11  Foundation, a 501(c)(3) non-profit public charity. The Foundation was formed in 2006 by Dr.

12  Reddy, Chairman of the Foundation's Board of Directors. The Foundation owns six non-profit

13  hospitals: four in California (Encino Hospital Medical Center, Huntington Beach Hospital,

14  Montclair Hospital Medical Center, and Sherman Oaks Hospital) and two in Texas (Knapp

15  Medical Center and Pampa Regional Medical Center). Each of these hospitals, with the

16  exception of Knapp Medical Center which was purchased directly by the Foundation in 2013, was

17  donated to the Foundation by Prime Healthcare Services debt free.

18  **II.**     **The Defendants**

19       17.    Defendant Service Employee International Union ("SEIU'') is an unincorporated

20  labor association with its principal place of business located at 1800 Massachusetts Avenue,

21  N.W., Washington, D.C. 20036. SEIU represents units of workers and attempts to negotiate

22  terms and conditions of employment for the workers it represents. SEIU transacts business

23  activities in interstate commerce, including in this judicial district.

24       18.    Defendant Service Employee International Union, United Healthcare Workers

25  West ("UHW") is a local union affiliate of SEIU with its principal place of business located at

26  560 Thomas L Berkley Way, Oakland, California 94612. UHW represents, among others,

27  individuals working in California's hospitals and clinics as nurses, aides (e.g., operating room,

28  physical therapy), assistants (e.g., laboratory, nurse, physical therapy), case managers, clerks,

1    coordinators, counselors, food service workers, maintenance workers, secretaries, schedulers,

2    technicians (e.g., central services, dietary, laboratory, pharmacy, radiology, surgical, ultrasound),

3    respiratory care practitioners, therapists, transporters, and housekeeping staff and attempts to

4    negotiate terms and conditions of employment for the healthcare workers it represents. UHW is

5    affiliated with, but legally distinct from, SEIU. UHW transacts business activities in interstate

6    commerce, including in this judicial district.

7        19.    UHW's Constitution and By-Laws are subordinate to those of SEIU and must be

8    approved by SEIU. Among other things, SEIU has the right to examine UHW's books and

9    records, audit its financials, approve or deny UHW proposed strikes, suspend or revoke UHW's

10   charter, or appoint a trustee to run UHW. In fact, that is exactly what happened to UHW in

11   January 2009: then SEIU President Andy Stern placed UHW in trusteeship, removed all of its

12   leaders, and appointed then SEIU Executive Vice President Dave Regan (now UHW's President)

13   as the trustee with full control over UHW.

14       20.    Defendant Mary Kay Henry is the President of SEIU, Secretary-Treasurer of

15   Change to Win, and member of the Board of Directors of the Coalition of Kaiser Permanente

16   Unions, which is controlled by SEIU and UHW. In these capacities, Defendant Henry has

17   developed, coordinated, directed, approved, and furthered the extortionate campaign against

18   Prime. Henry transacts business on behalf of SEIU, Change to Win, and the Coalition of Kaiser

19   Permanente Unions on a national scale, including in this judicial district.

20       21.    Defendant Dave Regan is the President of UHW, Vice President of SEIU, and

21   Vice President of the SEIU Leadership Council. In these capacities, Defendant Regan has

22   developed, coordinated, directed, approved, and furthered the extortionate campaign against

23   Prime. Regan transactions business on behalf of UHW and SEIU on a national scale, including in

24   this judicial district.

25       22.    SEIU's 2012 Constitution vests in its senior leaders power over unionization

26   campaigns, providing that "[t]he International President shall have general supervision and

27   direction of the organizing efforts" of SEIU. (Art. VIII, § 1(e).) More importantly, SEIU's

28   Constitution shows that SEIU's affiliated locals are constitutionally bound to commit resources

1  and finances to the execution of any aggressive unionization efforts SEIU decrees, including

2  unlawful unionization campaigns.  (Art. VIII, § 1(e), Art. XV, § 16(a).)  These constitutional

3  edicts were advocated for, drafted, and eventually implemented by a group of SEIU and local

4  leaders and affiliates—including Mary Kay Henry and Dave Regan.

5        23.    Defendant Change to Win is a union federation that was formed in 2005 when

6  seven of the nation's largest and most active labor organizations, led by SEIU, split from the

7  AFL-CIO.  Its principal place of business is located at 1900 L Street, N.W., Suite 900,

8  Washington, D.C. 20036.  Change to Win currently consists of three member unions – SEIU, the

9  International Brotherhood of Teamsters, and the United Farm Workers of America – and the

10  United Food and Commercial Workers International Union ("UFCW"), a founding member,

11  remains affiliated.  Change to Win is affiliated with, but legally distinct from, SEIU.  Change to

12  Win transacts business activities in interstate commerce, including in this judicial district.

13        24.    Change to Win not only has knowledge of SEIU's tactics, but also approves and

14  directly supports them.  Change to Win's Constitution requires all of its affiliated unions,

15  including SEIU, to "develop appropriate strategic organizing plans" that "focus on key target

16  areas important to increase market density . . . ."  (Art. XII, § 3.)  All such strategic organizing

17  plans must be approved by Change to Win's Leadership Council, its primary governing body,

18  which includes Mary Kay Henry and Tom Woodruff.  As such, Change to Win's Leadership

19  Council, including Mary Kay Henry and Tom Woodruff, approved the creation and execution of

20  the campaign against Prime, and along with all the Individual Defendants, directs, controls, and

21  coordinates it.

22        25.    According to its Constitution, Change to Win's campaign efforts are coordinated

23  through its Strategic Organizing Center, which was established "to develop and implement

24  comprehensive organizing campaigns . . . ."  (Art. XIII, § 1.)  The Constitution also mandates that

25  "at least 75 percent of all per capita [contributions] paid to the alliance shall be dedicated to the

26  operation of the Strategic Organizing Center and to Organizing."  (Art. XI, § 5.)

27        26.    Change to Win also supports the campaigns of its affiliates by hiring and providing

28  campaign staff.  According to its 2013 federal LM-2 filing with the U.S. Department of Labor,

DLA PIPER LLP (US)
SAN FRANCISCO

-8-

COMPLAINT

Change to Win paid SEIU almost $875,000 in 2013, including $853,122 for "Organizing Campaign In Kind Staff" and $21,446 for "Non-itemized items." Change to Win made similar payments to SEIU for the years 2010-2012 according to its federal LM-2 filings: $892,951 in 2012; $1,100,339 in 2011; and $1,921,927 in 2010.

27.     Change to Win's payments to SEIU were used to fund Defendants' campaign against Prime.

28.     Defendant CtW Investment Group is the investment arm of Change to Win. Its principal place of business is located at 1900 L Street N.W., Suite 900, Washington, D.C. 20036. Founded in February 2006, CtW Investment Group works with pension funds sponsored by unions affiliated with Change to Win, including SEIU and UHW. CtW Investment Group exploits the assets under its care to engage in shareholder activism in support of the corporate campaigns waged by the unions affiliated with Change to Win, including Defendants' campaign against Prime. CtW Investment Group transacts business activities in interstate commerce, including in this judicial district.

29.     Defendant Tom Woodruff is the Executive Director of Change to Win's Strategic Organizing Center. He previously led SEIU's nationwide organizing efforts beginning in 1996 and also served as an SEIU International Executive Vice President for more than a decade. In his capacity as the Executive Director of the Strategic Organizing Center, Woodruff, along with Mary Kay Henry and Dave Reagan, has developed, coordinated, directed, approved, and furthered the extortionate campaign against Prime. Woodruff transacts business on behalf of Change to Win on a national scale, including in this judicial district.

30.     Throughout this Complaint, unless otherwise indicated, "CtW" shall mean and refer to Change to Win and the CtW Investment Group; "Defendants" shall mean and refer to SEIU, UHW, CtW, Mary Kay Henry, Dave Regan, and Tom Woodruff; "Individual Defendants" shall mean and refer to Mary Kay Henry, Dave Regan, and Tom Woodruff; and "Prime" shall mean and refer to Prime Healthcare Services, Inc. and the non-profit Prime Healthcare Foundation.

**JURISDICTION AND VENUE**

31. Jurisdiction over Prime Healthcare Services' claims under 18 U.S.C. §§ 1962(a), (b), (c), and (d) is proper under 18 U.S.C. § 1961 *et seq.*, 18 U.S.C. § 1952 *et seq.*, 29 U.S.C. § 186, 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 28 U.S.C. § 1367.

32. Personal jurisdiction over SEIU is proper because it organizes California workers and collects dues from such workers in this State, has employees in this State, and regularly conducts business in the State. In addition, the exercise of specific personal jurisdiction over SEIU is proper because the intended effects of its conduct were expressly directed at Prime, a company which maintains its headquarters in this State, and, in fact, caused harm (as SEIU intended) to Prime in this State.

33. Personal jurisdiction over UHW is proper because it organizes California workers and collects dues from such workers in this State, has employees in this State, and regularly conducts business in the State. In addition, the exercise of specific personal jurisdiction over UHW is proper because the intended effects of its conduct were expressly directed at Prime, a company which maintains its headquarters in this State, and, in fact, caused harm (as UHW intended) to Prime in this State.

34. Personal jurisdiction over Change to Win is proper because it regularly conducts business in the State, including in this judicial district. In addition, the exercise of specific personal jurisdiction over Change to Win is proper because the intended effects of its conduct were expressly directed at Prime, a company which maintains its headquarters in this State, and, in fact, caused harm (as Change to Win intended) to Prime in this State.

35. Personal jurisdiction over CtW Investment Group is proper because it regularly conducts business in this State, including in this judicial district. In addition, the exercise of specific personal jurisdiction over CtW Investment Group is proper because the intended effects of its conduct were expressly directed at Prime, a company which maintains its headquarters in this State, and, in fact, caused harm (as CtW Investment Group intended) to Prime in this State.

36. Personal jurisdiction over Mary Kay Henry is proper because she transacts business activities in this State, including in this judicial district. In addition, the exercise of

1    specific personal jurisdiction over Henry is proper because the intended effects of her conduct

2    were expressly directed at Prime, a company which maintains its headquarters in this State, and,

3    in fact, caused harm (as Henry intended) to Prime in this State.

4            37.    Personal jurisdiction over Dave Regan is proper because he works in this State and

5    he transacts business activities in this State, including in this judicial district.  In addition, the

6    exercise of specific personal jurisdiction over Regan is proper because the intended effects of his

7    conduct were expressly directed at Prime, a company which maintains its headquarters in this

8    State, and, in fact, caused harm (as Regan intended) to Prime in this State.

9            38.    Personal jurisdiction over Tom Woodruff is proper because he transacts business

10    activities in this State, including in this judicial district.  In addition, the exercise of specific

11    personal jurisdiction over Woodruff is proper because the intended effects of his conduct were

12    expressly directed at Prime, a company which maintains its headquarters in this State, and, in fact,

13    cased harm (as Woodruff intended) to Prime in this State.

14            39.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391,

15    15 U.S.C. § 15, and/or 15 U.S.C. § 22.  Defendants transact business in this District.  Also, a

16    substantial part of the events giving rise to the claims occurred, were intended to, and did, cause

17    effects in this District.

18            40.    The conduct at issue occurred principally in this Division.

19                                           **ALLEGATIONS**

20   **I.**       **Defendants Use Corporate Campaigns as a Way of Conducting Business**

21         **A.**       **A Corporate Campaign:  The Death of a Thousand Cuts**

22            41.    To effectively obtain a target company's right to run its business or drive it from

23    the market, Defendants engage in a technique referred to as a "strategic campaign," "corporate

24    campaign," or "coordinated campaign."  Whatever it is called, it is a sophisticated, coordinated

25    system of extortion involving many actors and utilizing many enterprises to achieve its end.  In

26    the now infamous words of AFL-CIO President Richard Trumka:

27                   Corporate campaigns swarm the target employer from every angle,
                  great and small, with an eye toward inflicting upon the employer

28                   the death of a thousand cuts rather than a single blow.

1    *Union Officials Stress International Scope of Organizing, Bargaining Campaigns*, Daily

2    Lab. Rep. (BNA) No. 221 at A-5 (Nov. 16, 1992).

3         42.     A campaign seeks to create a perception among key stakeholders, consumers, and

4    policy makers that the target is a "corporate outlaw." A campaign also attempts to drive away

5    investors and consumers by labeling the target's products or services as substandard.

6         43.     The destruction of a target's brand is a well-planned and executed affair. A 2005

7    SEIU "Campaign Planning Chart" illustrates the elements and phases of a typical campaign.

8

9

10

11

12

13

14

15

16

17

18

19



20

21         44.     A campaign usually is initiated through the publication of a report that establishes

22    a negative "theme" for a phase of the campaign. The report fabricates or exaggerates a problem

23    that the union believes will resonate with the target's stakeholders. These reports appear to be

24    based on research and data, but in reality they are gross distortions of the record produced by

25    persons who work with the union for this purpose.

26         45.     Once a union establishes a campaign theme with a report, the target company is

27    subjected to escalating tactics designed to "prove" the problem exists. The nature of these tactics

28    are limited only by the creativity of the union, and they can include everything from

demonstrations and "street theater," legislative, regulatory, and legal attacks, misinformation campaigns, and assaults on business affiliations, opportunities, and customers to outright illegal conduct.

46.     The common thread to the attacks is that they must support the themes that are created to send a message to the employer and to win community and public support.  Those themes are then used to fuel the union's use of media and communications to disparage the target company.

47.     The typical union media strategy was described by UNI Global Union, a global union federation that is affiliated with and has adopted SEIU's campaign model to target the world's largest multinational companies, in connection with its call center campaign as follows:

> [t]o support each action with timely, strategic publicity to maximize the reach of the campaign to all audiences.  All news updates will be sent to affiliates . . . to update the website and provide stories for press coverage . . . .

UNI Global Union, Draft Concept Paper, "Changing the rules of the game in call centers" (Apr. 28, 2011).

48.     A campaign employs a similar integrated approach with respect to often baseless litigation raised to underscore campaign themes.  As described by UFCW, an early adopter of such campaigns (also a founding member of Change to Win and currently an affiliate of its Strategic Organizing Center), when talking about the use of litigation in its retail campaign:

> Each event would feature a [union] speaker . . . , a Nordstrom's victim (a former employee who is a party to one of the suits – wage and hour, etc.), and representatives of coalition groups. . . . The identical keynote remarks would be an indictment of Nordstrom's for discriminating against employees . . . . By filing a group of new legal actions at one time, we would be able to resurrect previous actions and draw attention to the weight of problems facing Nordstrom's.

Memorandum from Al Zack, Strategic Communications and Media, UFCW to Marv Hrubes, Director of Communications and Research, UFCW 1990.

49.     These coordinated attacks are designed to undermine confidence in the target company, disrupt its normal operations, and interfere with, impair, or destroy its business

1    relationships with its various constituents, including investors.

2         50.    Ray Rogers, the self-styled "father" of the modem corporate campaign, has

3    described the concept as follows:

4              The goal of a corporate campaign is to polarize the entire corporate
               and financial community away from a primary target, thus pulling
5              its most crucial underpinnings out from underneath it.

6    Jarol B. Manheim, *The Death of A Thousand Cuts: Corporate Campaigns and the Attack on the*

7    *Corporation* 53 (2009) (internal citation omitted).

8         51.    A 2005 SEIU Organizing Strategy presentation illustrates how the campaign

9    targets a company.



21        52.    A campaign is a long-term game of pressure, using sustained or escalating attacks

22   to damage the critical business relationships on which a company, or an industry, relies for

23   success.  Ultimately, a campaign seeks to threaten to inflict fatal damage to reputation or a brand

24   unless a company acquiesces to the union's demands.

25        53.    A number of labor organizations in the United States, and in particular Defendants,

26   along with several global labor federations, most affiliated with SEIU or CtW, have seized on

27   Rogers' tactics and have used corporate campaign tactics to force targeted companies to accede to

28   their unionization goals.   As several federal courts have noted, a union corporate campaign:

1  "encompasses a wide and indefinite range of legal and potentially illegal tactics used by unions to

2  exert pressure on an employer . . . [including] litigation, political appeals, requests that regulatory

3  agencies investigate and pursue employer violations of state or federal law, and negative publicity

4  campaigns aimed at reducing the employer's goodwill with employees, investors, or the general

5  public." *Food Lion, Inc. v. UFCW*, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997) (quoted by

6  *Smithfield Foods, Inc. v. UFCW*, 633 F. Supp. 2d 214, 219 (E.D. Va. 2008)).

7       54.    Jarol B. Manheim, a professor of Media Public Affairs and Political Science at The

8  George Washington University has written extensively on the subject of corporate campaigns,

9  characterizing them as an attack on a company or industry's ability to conduct its routine business

10  with the goal of forcing management to accede to union demands.  Jarol B. Manheim, *Trends in*

11  *Union Corporate Campaigns: A Briefing Book* 5, 13 (U.S. Chamber of Commerce, 2005).  In so

12  doing, according to Professor Manheim, unions employ political, economic, and legal pressure

13  tactics built around the media which constitute well-planned assaults on a corporation's

14  reputation and its business as a means of extorting the ends sought by the union.  (*Id.* at 7.)

15       55.    Simply stated, corporate campaigns are not traditional union organizing campaigns

16  that center on convincing employees of the benefits of union membership.  Instead, the "corporate

17  campaign" is a strategy designed to give the union leverage over a target's business operations.

18  This objective was succinctly articulated by SEIU-affiliated UNI Global Union when discussing

19  the aims of one of its global campaigns:

20                 A key aim of UNI-Europa Finance is increased employee
               involvement in the decision-making mechanisms of multinational

21                 companies.

22  UNI-Europa Finance, *Strategy on Multinationals*, *EWCs and SEs* 2 (2006).

23       56.    In other words, campaigns seek to create an environment where a union can

24  achieve any number of objectives, only one of which may be organizing.  Very often, as is the

25  case with the campaign against Prime, the objective is to enrich the campaign participants by

26  exercising control over a target or an industry so as to prevent market-based decision making that

27  may incidentally have a negative effect on union membership or contracts.

28       57.    To the extent campaigns concern themselves with organizing, they eschew the

legal and regulatory framework established by Congress under the National Labor Relations Act ("NLRA") and, instead, pursue "top-down" organizing techniques.  As stated by Stephen Lerner, who was at the time the Organizing Director for SEIU:

> Instead of asking, 'How do we win a majority of votes?', we should be asking, 'How do we develop power to force employers to recognize the union and sign a contract?

Stephen Lerner, *Let's Get Moving: Labor's Survival Depends on Organizing Industry-Wide for Justice and Power*, 1 Lab. Research Rev. 1, 8 (1991).

58.   Defendants have concluded that it is easier to force an employer into unionizing en masse than it is for the union to play by the rules established by Congress under the NLRA.  The reason it is easier is because top-down organizing eliminates any realistic opportunity for employees to vote against representation, something that happens approximately half of the time when employees are provided the opportunity to vote in a secret ballot election pursuant to the rules established by the NLRA.

59.   The NLRA representation election rules require that a union first obtain the support of at least 30% of a group of employees in an appropriate bargaining unit to invoke the statutory representation mechanisms.  If the union garners sufficient support, the NLRB will supervise a secret secret-ballot election among the employee-group, in which the employees may vote either for or against representation.  During this process, employees have an opportunity to hear the pros and cons of unionization, as well as debate those issues among themselves.  If the union wins such an election by a majority vote and becomes certified by the NLRB as collective bargaining agent for the employees, the employer and the union at that point may enter into bargaining for a collective bargaining agreement.  Collective bargaining under the NLRA is a give-and-take process, where employers lawfully may make concessionary proposals to properly account for new conditions or demands by the union, as well as local economics.

60.   A "corporate campaign" seeks to circumvent this process by using pressure and smear tactics to force an employer to play by an entirely different set of rules made by the union—rules which usually contain three critical components.  First, corporate campaigns seek to compel an employer to deprive its employees of the statutory right to a secret-ballot election.

Rather, they seek to compel the employer to recognize the union through "card-check," a method of selection where the union itself collects signed authorization cards directly from employees, almost always in full view of union organizers.

61.     Second, under the misleading term "neutrality," corporate campaigns seek to deprive employers of their statutory right to free speech and thereby virtually ensure that employees will be deprived of the benefit of any views opposite to the union on the issue of representation.  The employer must concede to the union entirely the podium of debate on the question of unionization by remaining neutral during subsequent card signing drives.

62.     Third, campaigns seek to force employers to sacrifice their property rights by allowing a union access to its facilities during working hours so that the union can attempt to convince employees to sign union cards that will be used by the union to become the representative of the employees.  All of these actions, of course, are done for the purpose of obtaining other employer property rights including, but not limited to, the right of the employer to conduct its business as it sees fit, its goodwill in the market, and millions of dollars in new union dues and other payments.

63.     Depending on the business of the targeted employer, a campaign also may attempt to establish a broad bargaining unit of many employees, usually one that is company-wide or within a certain geography, and which the union could never achieve under NLRB rules.  These broad and extra-statutory units have the effect of excluding all other unions from asserting representation rights.

64.     The benefits to the union of depriving employers and employees of their statutory rights are substantial.  Once the union eliminates the employer's right to speak, gains access to the employer's property, and obtains the right to be recognized solely on the basis of authorization cards collected by the union, the rate of unionization of the targeted employer's employees increases dramatically.  While unions win approximately fifty percent of secret ballot elections, unions almost never lose an election under the rigged system coerced through a campaign.

65.     Corporate campaign tactics are employed by some unions because of the

1   substantial benefits that flow from union recognition.  When an employer recognizes a union, a

2   host of federal statutory obligations are triggered immediately, even before a labor contract is

3   negotiated or signed.  Upon recognition, the union obtains the instant right to have a significant

4   say in the operation of the employer's business affairs and, as a practical matter, entitlement to

5   dues money from its new members.  Upon recognition, the employer and the union must engage

6   in exclusive and good-faith bargaining in relation to all terms and conditions of employment, no

7   matter how small.  Simply stated, the employer immediately cedes a substantial portion of its

8   autonomy and control over its own affairs to the union.  Through recognition, the union obtains

9   this immediate "seat at the table" even before contract negotiations begin.  In most every respect,

10  the employer can no longer make business decisions that could impact its employees without first

11  obtaining the advice and consent of the union.

12      66.    The approach of extorting an employer into forced union recognition, without

13  regard for the level of employee interest in forming or joining a union, has been articulated

14  succinctly in the article, "The Pressure is On: Organizing Without the NLRB," written by former

15  UFCW organizer Joe Crump.  In that article, Crump states:

16          Who do we really need to convince of the advantages of being
            union?  Employees or employers.  Organizing without the NLRB
17          means putting enough pressure on employers, costing them enough
            time, energy and money to either eliminate them or get them to
18          surrender to the union... One of the concerns organizers might have
            about waging economic war on an unorganized company is that it
19          might turn employees against the union.  I look at it this way:  If
            you had massive employee support, you probably would be
20          conducting a traditional organizing campaign.

21  Joe Crump, *The Pressure Is On: Organizing Without the NLRB*, 1 Lab. Research Rev. 18,

22  35-36 (1991).

23      67.    Crump defined a union corporate campaign's success in one of two ways:  "either

24  a ratified, signed collective bargaining agreement with a previously non-union employer or a

25  significant curtailment of a nonunion operator's business, including shutting the business down.

26  Neither of these outcomes will occur by relying on the NLRB."  (*Id.* at 34.)

27      68.    Distilled to their essence, corporate campaigns are a means of forcing a company

28  to sacrifice its legal and property rights through economic, political, legal, and media pressure.

**B.      SEIU's Playbook For Extortionate Campaigns.**

69.      In 1988, SEIU published its own manual instructing union members how to intimidate, smear, and extort employers targeted by the union for corporate campaigns:   the Contract Campaign Manual.   The Manual has been a blueprint for Defendants' extortionate campaign against Prime.

70.      The Manual is stunning in its candor, including its observation that union corporate campaigns often involve a conscious choice to break the law in order to be more effective, to force employers to accede to demands for unionization.   SEIU reserves an entire section of its Manual – "Pressuring the Employer" – for describing in detail its most powerful extortion and smear tactics.   That section's introduction notes that "Outside Pressure can affect relationships between the employer and lenders, investors, stockholders, customers, clients, patients, tenants, politicians, or others on whom the employer depends for funds."   (Manual at 4-4.)   It also states that "community action and the use of the news media can damage an employer's public image and ties with community leaders and organizations."   (*Id.*)

71.      SEIU believes these tactics to be effective because "the threat of action often has more psychological effect on management than the action itself because they don't know exactly what the impact will be."   The introduction concludes by noting that pressure campaigns often require many different tactics and belies the real motivation underlying union corporate campaigns:   "[y]ou have to put pressure in many ways so that the total cost of your campaign to the employer begins to outweigh the benefits of rejecting your proposals."   (*Id.*)

72.      The Manual suggests that one of the first steps in designing an effective extortion campaign is determining how such pressure will hurt the target financially.   In asking the reader to consider the purpose of each potential pressure tactic, the Manual states:

o **Costing the employer money.**  Can you threaten to or actually:

- Reduce productivity?

- Increase costs?

- Affect a private company's relationship with sources of income, such as customers, clients, investors, or lenders?

- Affect a private company's access to public funds?

- Affect a public employer's relationship with legislators or top government executives such as the governor or mayor?

- Create bad publicity which would, in turn, affect the relationships described above?

- Cause the courts or regulatory agencies to enforce laws or regulations the employer has failed to obey?

- Directly affect the careers or other interests of individual management officials?

(*Id.* at 4-7.)

73. In this regard, the Manual encourages union campaigners to focus on a target's lenders and investors: "If those lenders/investors decide that because of your dispute it is not worth their while to help finance the employer, the employer may have increased financial incentives to settle." (*Id.* at 4-21.) The Manual also suggests that a good campaign "may be able to threaten the relationship between a company or agency and the customers, clients, tenants, or patients it depends on for income." (*Id.* at 4-22.) It further advises campaigners to assess how best to "embarrass [company managers] in front of their superiors, associates, families, neighbors or friends in the community." (*Id.* at 4-8.) An effective campaign should "figure out who really holds the power and tailor your tactics to affect them." (*Id.* at 4-9.)

74. The Manual also suggests that a campaign should avail itself of the legal process, not to seek legitimate redress for the target's violations of law, but to distract the target's executives, drain its resources, and increase the extortionate pressure:

> [E]ven if the violations [of applicable laws] are completely unrelated to bargaining issues, your investigations may give management added incentive to improve its relationship with you . . . [T]he employer is now facing:
>
> - Extra expense to meet regulatory requirements or qualify for necessary permits or licenses.
>
> - Costly delays in operations while those requirements are met.
>
> - Fines or other penalties for violating legal obligations.

- Damage to the employer's public image, which could jeopardize political or community support, which in turn could mean less business or public funding.

(*Id.* at 3-21.)

75.     The Manual also advocates engaging friendly politicians to generate outside pressure on an employer target.  "Political pressure," claims SEIU, can be used in two ways:  (1) to "draw politicians into" the union's fight; and (2) to send a message to management officials that if they do not heed union demands, "union members will be more inclined to push for legislative action on other issues that would affect management."  (*Id.* at 4-28.)  In keeping with SEIU's overall theme of extorting a target by causing it substantial financial and business injury, campaigners are encouraged to press politicians for "changes in the way employers are taxed, awarded public funds, or required to provide service."  (*Id.*)  The Manual actually suggests that a campaign should pressure the politicians themselves into taking harmful action against the target employer if those politicians are not inclined to cooperate with the union.  (*Id.* at 4-31.)

76.     The Manual also notes that applying pressure directly on individual executives and managers can be a most effective tactic.  SEIU suggests that this tactic works best in the case of company managers who have good reputations:  "If they have built a good reputation through involvement in community service or religious organizations, for example, both they and those groups may find it potentially embarrassing to be linked to racism, sexism, exploitation of immigrants, or proposals that would take money out of the community for the benefit of distant stockholders."  (*Id.* at 4-32.)  In other words, managers who have not engaged in corporate misdeeds, or any misdeeds for that matter, but, instead, who are recognized in their communities and churches as good citizens, are the ones most likely to be negatively affected by a union smear campaign and, therefore, are the most likely to yield to extortionate threats.

77.     The Manual further instructs campaigners on how to take advantage of the media in order to harass and pressure a target employer:  "Use of the media" can put pressure on the employer and support all of the other tactics discussed in this part of the Manual.  For example, media coverage and advertising can help to:

- **Give customers, clients, investors and others in the community reasons to cut off economic ties with the employer.** Media attention can convince the community of the justice of your cause, or can make businesses or individuals feel that they don't want to be involved with the employer while it is getting such bad publicity.

- **Make individual managers nervous about the effect bad publicity may have on their careers and reputations.** If they see that you have the ability to use the media successfully, they may worry that you will be able to publicize unfavorable information about their activities.

(*Id.* at 4-71.)

78.     To help maximize media coverage, the Manual suggests that campaigners "create" news designed to spotlight allegations of employer wrongdoing: "For the most part, getting free news coverage depends on creating 'newsworthy' events – events that can be shown visually, that are unusual in some way, that involve action by large numbers of people, or that involve well-known public figures." (*Id.* at 4-84.)  To help facilitate this process, campaigners are encouraged to increase the size and intensity of union-led protests and attacks on target employers and/or their business relations by recruiting, or even paying for, outside assistance:  "Other unions or community groups may be able to beef up demonstrations or rallies by supplying demonstrators who are not afraid of losing their jobs, are used to confronting authorities, or have more convenient schedules." (*Id.* at 4-62 to 4-64.)

79.     The Manual also suggests that unions take advantage of other groups, such as students, to help enhance a pressure campaign:

> Other organizations in the community . . . may already have done research and organizing you can take advantage of.  For example . . . Groups of students, people who receive government benefits, or other 'consumers' of public services who may be organizing to demand improved services or benefits.

(*Id.* at 4-63.)

80.     SEIU's extortion playbook does not end there.  The Manual also advises would-be campaigners to break the law in order to increase the pressure on a targeted employer.  (*Id.* at 4-58.)  The Manual urges campaigners to remember that "the job of [the union's] lawyers is not to make the decisions for us about when and how to obey the laws," and actually suggests that

1   sometimes disregarding a lawyer's advice against violating the law may be the best course of

2   action.  (*Id.*)  It states:  "[t]heir job is to tell you what the laws are and how they are likely to be

3   interpreted by the courts.  Using that advice, union members and their elected leaders must then

4   weigh the risks and benefits of potential actions."  (*Id.*)

5           81.    The reason for doing this, claims SEIU, is that if a union turns up the pressure high

6   enough, an employer might not have the will to challenge a union's illegal conduct:

> - In many situations, employers may have a strong incentive not to take legal action against workers or their union.  Legal action, no matter who initiates it, may expose an employer to the process of "discovery," which means that the union has the legal right to subpoena employer documents and witnesses in order to prepare its case. The employer may feel that revealing inside information through that process is too risky.
>
> - Lawsuits also may mean more publicity, which the employer may not want.
>
> - Certain acts which might technically be illegal might be seen by the public, news media, customers, or other potential worker allies as justifiable and not something the employer should be challenging.
>
>         * * * *
>
> - Even if workers or the union might be found guilty, you have to consider what the penalty is likely to be.  If a civil lawsuit might be involved, what damages could the employer actually prove and collect?

18   (*Id.* at 4-59.)

19           82.    Perhaps the most stunning revelation is SEIU's admission that it is necessary to

20   blackmail or extort a target employer in order to maximize a campaign's effectiveness, and it

21   should be done in a way that diverts the blame to the target employer's employees.  The Manual

22   notes, "[t]here is no law against union members who are angry at their employer deciding to

23   uncover and publicize factual information about individual managers."  (*Id.* at 4-33.)  In other

24   words, SEIU acknowledges that its campaign tactics violate extortion laws but suggests that a

25   campaigning union can get away with these tactics, nevertheless, by making its threats appear to

26   have originated with anyone but itself.

27           83.    By designing their corporate campaigns to appear to be employee-led uprisings,

28   Defendants hope to conceal their true involvement from everyone but the targeted employer.

This sophisticated sleight of hand can prove intellectually vexing, emotionally frustrating, and psychologically and financially devastating for the targeted employer.

84.     Since the original publication of the Manual in 1988 and its republication in 2005, SEIU has continued to refine the tactics discussed above and adapt them for use in situations where its goal is to force a non-union employer to allow the unionization of its employees without a secret ballot vote under NLRB procedures.

**C.     Defendants As Social Activists**

85.     Recognizing that their extortionate conduct is not the type of activity that is entitled to protection under the NLRA, Defendants cloak their tactics by claiming to act as "social activists." The opening pledge in the SEIU's Mission Statement of its Constitution and Bylaws provides broadly:

> We are the Service Employees International Union, an organization of more than 2.1 million members united by the belief in the dignity and worth of workers and the services they provide and dedicated to improving the lives of workers and their families and creating a more just and human society.

SEIU 2012 Constitution at 1.

86.     Calling itself "one of the largest progressive advocacy groups in North America" provides SEIU with the necessary "cover" to engage in otherwise extortionate conduct under the guise that it is its Mission to call attention to targets it characterizes as "poor corporate citizens" in the areas of patient care, industry regulation, the environment, shareholder accountability, anti-corruption, and fraud.

87.     Defendants' campaign against Prime, as explained in one of their self-serving "studies" attacking Prime, is wrapped in the packaging of a "corporate accountability campaign" involving them working "with community allies and governmental agencies to responsibly investigate and expose to public view inappropriate corporate conduct of whatever type and thus positively impact a broad range of CSR [corporate social responsibility] issues."

**II.     The Formation of the Conspiracy**

**A.     Defendants Need To Eliminate Non-Union Threats In Order To Survive.**

88.     By the 1990s, Defendants were moving away from the traditional model of

organizing to the wide-ranging use of corporate campaigns detailed above. In the place of a lawful organizing model, Defendants adopted a strategy that spoke in terms of market domination. Under this new approach the key aim of any union organizing effort was for unions to win a decisive market share in industries by increasing "union density" and controlling the "labor supply" and to gain the ability "to take wages out of competition and raise standards." In other words, the goal of the density strategy is to eliminate competition in the market for service workers represented by Defendants and establish supra-competitive wage rates for such services in the relevant market.

89. Defendants recognized that they could not achieve market dominance as long as the market place remained open to competition – competition not from the organizing efforts of other unions but competition from companies operating in the same market as companies organized by Defendants. Defendants knew that they could not achieve their goals in a competitive market because union employers would resist incurring higher wage costs and risk losing market share to competitors who maintain lower costs structures. Defendants concluded, therefore, that unless the majority of employers were bound to union agreements or Defendants were able to raise those employers' costs in some other way, Defendants' contracts and representations would become untenable and their model would collapse.

90. At around the same time, non-union competition in the healthcare industry was placing tremendous competitive pressure on labor costs at union dominated healthcare providers. Labor costs are critical in the hospital industry, which is a labor-intensive industry. While labor costs for businesses may generally average thirty percent of expenses, in the healthcare industry, those percentages are significantly higher.

91. In order for Defendants to succeed, non-union competitors of unionized healthcare providers had to be brought to their knees. That meant making certain that costs to the non-union competitors were increased to a level at or above the unionized healthcare providers' costs, or forcing these non-union competitors to withdraw from the market completely.

### B.   Protecting Their Interests Through Extortionate Campaigns Is Defendants' Regular Way of Doing Business

92.   Defendants have spent more than a decade waging extortionate campaigns against several non-union healthcare providers who, at the time, threatened Defendants.  Specifically, prior to Prime, Defendants targeted Columbia/HCA, Tenet, and CHW (now Dignity Health); what Defendants did to Columbia/HCA, Tenet, and CHW they are now doing to Prime.

93.   In 1988, Columbia Healthcare was formed in partnership with just two hospitals in El Paso, Texas.  Columbia's ability to provide superior services at lower costs enabled it to grow rapidly.  By September of 1993, it owned 99 hospitals.  In February of 1994, Columbia merged with Hospital Corporation of America to form Columbia/HCA, a $10 billion company.

94.   Beginning in 1995, Columbia/HCA was targeted by Defendants' "Code Columbia" campaign, which so damaged Columbia/HCA's business, it was compelled to enter into an agreement with Defendants.  Defendants' tactics included raising allegations of Medicare and Medicaid fraud, blocking hospital acquisitions, and issuing "reports" filled with patient care horror stories.  Those actions significantly damaged Columbia/HCA's business.  For example, Defendants' actions and allegations of impropriety at Columbia/HCA resulted in the Joint Commission, a hospital accrediting agency, rescinding its award of an "accreditation with commendation" to a Columbia/HCA hospital and downgrading that hospital's accreditation.

95.   Defendants' next target was Tenet.  At the time, Tenet was the nation's second largest for-profit hospital chain and its biggest market was California, where it owned 42 of the State's 450 hospitals.  Defendants alleged, among other things, that Tenet inflated costs for hospital care, ran up taxpayer funded Medicare bills, increased the amounts insurers were required to pay, and put patients at risk.  Those allegations were based on Defendants' "reports" and "studies" designed to cast the worst possible light on Tenet's patient services and healthcare practices.  Defendants' actions also resulted in investigations of Tenet by the Federal Bureau of Investigation, the Department of Health and Human Services, Medicare, and the California Office of Statewide Health Planning and Development.  Unable to endure these attacks any longer, Tenet struck a deal with SEIU and UHW in 2003, which raised its cost-structure and made it less

1   of a market threat to unionized healthcare providers.

2   96.   In the early 2000s, Defendants set its sights on a new threat, a hospital chain

3   sponsored by nine orders of Catholic nuns:   CHW.   In the decade before Defendants' attacks,

4   CHW had grown from 12 hospitals to the "largest not-for-profit health care system in the West"

5   according to its 1998 annual report.   It operated 48 hospitals in California, Nevada, and Arizona.

6   In addition to its ordinary litany of patient care and billing and Medicare fraud allegations,

7   Defendants used CHW's status as a Catholic healthcare provider against the company.

8   Specifically, Defendants leveraged the support of the U.S. Conference of Catholic Bishops and

9   the Cardinal of Los Angeles to force CHW to reach an agreement with SEIU and UHW.   This

10  raised CHW's cost structure, making it less of a competitive threat.

11  97.   Defendants' thinly-disguised goal with these campaigns was simply to mitigate

12  competition against unionized healthcare systems by forcing each target to adopt the same

13  uncompetitive business model or to make each target's costs prohibitive by spending money

14  responding to attacks from the union.

15  98.   The pressure of Defendants' campaign was eventually too much for each of the

16  hospital systems to bear and each one finally capitulated and reached an agreement with

17  Defendants.   Once the targeted hospital system agreed to Defendants' demands, any alleged

18  problems that Defendants had identified with the respective system disappeared.

19  **III.   Defendants' Unlawful Scheme to Extort Prime**

20  **A.   Prime as a Threat**

21  99.   Defendants' destructive campaigns against Columbia/HCA, Tenet, and CHW

22  largely succeeded in mitigating the competitive pressure faced by non-unionized healthcare

23  providers.   A new challenge, however, arose in the form of Prime, which purchased its first

24  hospital in California in 2001.

25  100.   The quality and quantity of services that Prime introduces to the emergency and

26  acute care hospital markets creates a competitive problem for union-dominated hospitals.

27  Patients are attracted to Prime hospitals, so unionized hospitals cannot continue to skimp on

28  services.   Treatment of a commercial enrollee at a hospital provider like Prime thus has a

significant impact on union-dominated healthcare providers' costs, profits, and reputational interests that threatens the success of those providers' business model, which is integrated with SEIU and UHW membership.

101.   Simply stated, when the business model of a unionized hospital system is threatened by a largely non-union hospital system like Prime, Defendants are threatened. The corollary is also true. When Defendants attack Prime and undermine its goodwill and customer relationships, union-dominated hospital systems, like Kaiser Permanente, benefit and so do SEIU and UHW, who organize and represent healthcare workers at those hospitals. In other words, because the business interests of SEIU and UHW are so directly and fundamentally intertwined with union-dominated hospital systems, any benefit transferred from a competitor like Prime to a union-dominated hospital is, in reality, transferred to SEIU and UHW.

102.   As a result, when Defendants attack Prime and its business model, the goodwill and customer relationships that Prime has spent years and millions of dollars building are transferred to union-dominated hospitals, like Kaiser Permanente. That increased goodwill and those customer relationships are then passed through to Defendants as both increased goodwill, because Defendants represent healthcare workers at those hospitals, and as increased dues payments, because the union-dominated hospitals remain viable competitors due to the increased goodwill and customer revenue.

103.   In addition, Kaiser Permanente and the SEIU-controlled Coalition of Kaiser Permanente Unions have developed an elaborate scheme to make payments in the tens of millions of dollars from Kaiser Permanente to SEIU and UHW, as well as other unions. Specifically, under their Labor Management Partnership ("LMP"), Kaiser Permanente pays approximately $20 million a year to the Labor Management Partnership Trust (the "Partnership Trust"), a trust fund ostensibly established for the purpose of carrying out activities under the LMP; the payments from Kaiser Permanente constitute more than 97% of all revenue received by the Partnership Trust. The Partnership Trust then turns around and transfers tens of millions of dollars – more than $7 million in 2011 alone – to the SEIU-controlled Coalition; the payments from the Partnership Trust constitute more than 93% of all revenue received by the Coalition.

104.   Since 2004, the earliest year for which tax documents were available, Kaiser Permanente has paid over $150 million to the Partnership Trust, and the "trust," using money it almost exclusively receives from Kaiser Permanente, has paid over $51.5 million to the Coalition – money to Defendants' control.  The Coalition also pays money directly to SEIU and UHW: over the past ten years, the Coalition has made almost $3 million in such payments.  These payments are made on a regular basis and, at a minimum, annually.

105.   The Partnership Trust and the Coalition are run by Kaiser Permanente and Defendants:  the current President of the Coalition is Mary Kay Henry and the prior President, from at least 2002 to mid-2010, was Andy Stern, then President of SEIU; the current Coalition Executive Director, Hal Ruddick, is a former UHW official, and the prior Executive Director, John August, is a former SEIU official; and for each of the years for which there are publicly available tax documents for the Partnership Trust, the overwhelming majority of the trustees were employed by or affiliated with Defendants and Kaiser Permanente.

106.   The money paid by the Partnership Trust to the Coalition, and the portion of that money then paid by the Coalition directly to SEIU and UHW, is used to fund the campaign against Prime, and similar campaigns against others.  Indeed, to the extent that Prime is successful in the market, a major source of funding for the Partnership Trust, the Coalition, and SEIU and UHW, and the very existence of unionized healthcare providers, are threatened.

107.   This multifaceted threat posed by Prime has led Defendants to seek to eliminate Prime from the market unless it capitulates to Defendants' unionization demands and surrenders control of its business to Defendants.  To achieve this end, Defendants have engaged in a sophisticated and coordinated assault that utilizes the combined resources of different entities and that acts, at various times, through different enterprises sometimes individually and at other times associated together.

**B.   Defendants Have a Direct Financial Motive to Extort Prime**

108.   In addition to foreclosing competition against unionized hospital operators, thereby guaranteeing Defendants' ongoing viability, and the unlawful payments laundered through the LMP detailed above, Defendants have another direct financial incentive to engage in

their extortionate campaign against Prime:  if Defendants successfully force Prime to allow the unionization of tens of thousands of its non-union healthcare workers, it would result in millions of dollars in dues and other payments from Prime to SEIU and its affiliated locals, including but not limited to UHW.

109.    As of the date on which SEIU's 2012 Constitution became effective, SEIU receives a per capita tax on all dues received by its local unions in the amount of $7.65 per member, per month.  (Art. XIII, § 1(a).)  Unionizing Prime's non-union healthcare workers would mean substantial additional revenue to SEIU.  In addition to this per capita tax, each local must pay an additional per capita tax in the amount of $5.00 per member to finance the "Unity Fund," SEIU's dedicated revenue source for organizing campaigns.  (Art. XIII, § 1(d).)

110.    The SEIU Constitution also imposes on affiliated locals "minimum dues," which are the lowest permissible amounts to be assessed against members.  Minimum dues range from $27.00 to $32.00 per member/per month and are by Constitutional provision set to increase by one dollar each year.  (Art. XV, § 6(a).)  Unionizing Prime would result in substantial financial gain to UHW.

111.    CtW also stands to reap significant financial and strategic rewards from unionizing Prime.  As discussed above, Change to Win's Constitution obligates each union affiliate to pay it a per capita tax of $0.25 per member/per month.  (Art. XI, § 2.)  Also, by constitutional mandate, at least 75% of Change to Win's per capita tax "shall be dedicated to the Strategic Organizing Center and to organizing."  (Art. XI, § 5.)  For Change to Win, a unionized Prime would result in a substantial increase in per capita contributions from SEIU, which, in turn, would allow Change to Win to facilitate future corporate campaigns.  It would also lead to an increase in pension funds managed and subject to manipulation for campaign purposes by CtW Investment Group.

### C.    Defendants Are Attempting to Obtain Prime's Property

112.    The actions and events described in this Complaint constitute acts or threats undertaken by Defendants with the specific intent to extort money, property, goodwill and customer revenues, and pecuniary benefit from Prime.  Therefore, such acts and threats are separately chargeable as extortion under the laws of California, Kansas, New Jersey, and the

District of Columbia.

113.    The specific property Defendants are attempting to obtain from Prime includes, but is not limited to, the following:

- Prime's business reputation and goodwill which it has spent millions of dollars developing over many years in the market;

- Monies invested in Victor Valley Community Hospital in anticipation of Prime's acquisition of that hospital;

- Prime's relinquishment of substantial autonomy and control over its business operations and, at the same time, turning over to Defendants for their own use and exercise, a significant portion of that autonomy and control;

- Prime's recognition of SEIU and/or its affiliated locals including, but not limited to, UHW, as bargaining agent of Prime's non-union employees, at current and future Prime facilities in the United States that have not, to date, been organized by SEIU or any other labor union;

- Prime's agreement to allow SEIU and/or its affiliated locals including, but not limited to, UHW, to exercise for Prime its right to insist on secret-ballots elections conducted by the NLRB at each Prime facility SEIU selects for unionization, by forcing Prime to waive such right;

- Prime's agreements to allow SEIU and/or its affiliated locals including, but not limited to, UHW, to exercise for Prime its right guaranteed under Section 8(c) of the National Labor Relations Act to voice its opinion about, and/or opposition to, attempts to unionize its employees, by forcing Prime to waive such right and remain neutral and therefore silent on the matter, thereby allowing SEIU and/or its affiliated locals including, but not limited to, UHW, to fill the void created by Prime's forced silence with additional communications to employees regarding unionization;

- Prime's agreements to allow SEIU and/or its affiliated locals including, but not limited to, UHW, to exercise for Prime its right to refuse to recognize UHW as bargaining agent of Prime's employees on the basis of signed union authorization cards, by forcing Prime to waive such right and to recognize UHW as such bargaining agent on the basis of such cards;

- Prime's agreement to give up its right to exclude representatives of SEIU and/or its affiliated locals including, but not limited to, UHW, from premises under its control and instead to allow UHW to have physical access to its facilities and employees to which UHW is not otherwise entitled;

- Contributions by Prime to other funds benefiting Defendants, including but not limited to, certain of Defendants' pension funds;

- Prime's agreement to enter into collective-bargaining agreements with SEIU and/or its affiliated locals including, but not limited to, UHW;

- Prime's money in the form of union dues paid to Defendants by Prime on behalf of Prime's employees that are the target of Defendants' extortionate scheme; and

- Prime's current and potential customers and related revenues by inducing fear in patients who have sought treatment at Prime hospitals, as well as patients who might have sought treatment but for Defendants' false and misleading campaign.

114.    Defendants have no lawful claim or any other claim of right to any of the money and other property demanded from Prime.

115.    The actions and events described in this Complaint were undertaken by Defendants themselves, or by and through their agents and with their actual knowledge, approval, and/or ratification, in furtherance of the unlawful conspiracy alleged herein to extort money and other property, both tangible and intangible, from Prime and to acquire unlawfully an interest in, or control of, Prime's business affairs by interfering unlawfully with Prime's relations with its employees, customers, business partners, investors, lenders, and the general public and by inflicting repeated and substantial financial injury upon Prime.   The actions and events taken against Prime were not isolated, but were related in that each has the same or similar purpose, participants, victim, and methods of commission, and are designed to obtain the same result.

116.    Such actions are part of a pattern of repeated conduct, directed by Defendants against Prime, in a closed, but substantial, period of time, commencing in or around 2010 and continuing through and including the present.

117.    Defendants' racketeering activity described herein also poses a distinct threat of long-term continued criminal activity because Defendants' past extortionate conduct, and use of unlawful payments laundered through the LMP in violation of federal law to fund the campaign against Prime and similar campaigns against others, by their nature, project into the future with a clear threat of repetition.   To allow Defendants to achieve their objectives, Prime would have to surrender to Defendants the various property rights described above time and time again, each time that Defendants select another Prime facility for unionization.   Moreover, under federal labor law, Defendants can unionize Prime's employees only one new bargaining unit at a time. Therefore, Prime's delivery of the property rights described above will occur one new bargaining unit at a time.   Unless and until Prime capitulates to Defendants' threats as to each new facility and each new bargaining unit, Defendants will continue to use unlawful payments laundered through the LMP in violation of federal law to fund a never-ending campaign against Prime.

118.    Defendants' racketeering activity described herein involved interstate travel or the use of interstate facilities and was undertaken with the intent to further Defendants' extortionate campaign against Prime.

119.    Defendants' extortion scheme is also of an indefinite nature.   The number of locations at which Prime has employees is expanding.  Every time that Prime builds or acquires a new facility, acquires new patients or hires new employees, Defendants will be presented with yet another opportunity to unionize Prime's healthcare workers, both on the terms they previously have demanded and under the cloud of their prior extortionate threats.  There is no fixed end to Defendants' scheme.

120.    The actions taken by Defendants in furtherance of this pattern reflect their regular way of doing business.  Prime is yet another example of an entity which has been the target of Defendants' extortionate scheme.

**IV.    The Conspiracy Targets Prime**

121.    Because Prime has a competitive advantage over union-dominated healthcare providers, and union-dominated healthcare providers are incapable of competing with Prime on the relative merits, Defendants have engaged in an escalating pattern of extortionate practices and other unlawful activity with the specific design and purpose to impose unionization on Prime or force it to exit the market entirely.   Defendants' extortionate campaign began in 2010, has encompassed numerous extortionate and unlawful acts, and continues unabated to this day.

122.    As described above, the entity Defendants' own self-governing documents, as well as their shared personnel at high levels, show that Defendants are required, and have agreed, to carry out the extortionate campaign against Prime, and to fund it with unlawful payments laundered through the LMP, by working in concert and by dedicating and utilizing substantial financial resources towards its end.   This cooperation between and among the Defendants mandated by their own self-governing documents is the means through which they conceived and carried out, and continue to carry out, the campaign against Prime.  SEIU's primary role under Mary Kay Henry's leadership included, among other things, authorizing the campaign for which the Manual was used as a blueprint, coordinating the campaign's overall activities, providing

direction to UHW, and deriving revenues.  UHW's primary role under Dave Regan's leadership included, among other things, communicating the Defendants' threats against Prime and its executives, publishing or causing to be published false information about Prime, misleading state officials, manipulating the media, interfering with Prime's hospital acquisitions, engaging in sham lobbying efforts, and deriving revenues.  CtW's primary role under Woodruff's direction included, among other things, attacking Prime's affiliates, including MPT, funding and allocating resources to support the campaign, and deriving revenues.

123.    Accordingly, Defendants' campaign against Prime, and the use of unlawful payments laundered through the LMP to fund it, is approved, ratified, and coordinated on a strategic level by SEIU and its leadership, including Henry; UHW and its leadership, including Regan; and within Change to Win's Strategic Organizing Center, which is led by Woodruff, a former SEIU executive previously responsible for coordinating SEIU's national campaigns. Indeed, no corporate campaign can be initiated until it has been approved by CtW's Leadership Council, which includes Mary Kay Henry and Tom Woodruff.

124.    In addition, the Individual Defendants, acting on behalf of themselves and the entity Defendants consistent with their self-governing documents, have coordinated with each other, directed, approved, and ratified each of the actions and events described in this Complaint in furtherance of the campaign against Prime.

### A.    Defendants Have Threatened Prime And Admitted That The Campaign Would Cease Only And Unless Prime Surrenders To Defendants' Demands

125.    In early 2010, Prime rejected UHW's demand, on behalf of all Defendants, for a "deal" – a quick labor contract on UHW's terms in order to fend off a competing labor union – at Prime's Centinela Hospital Medical Center.  During discussions on this subject during late 2009, and in an effort to force Prime to accept Defendants' demands, UHW representative Danny Bush threatened to publicly expose alleged "dirt" on Prime by disseminating "reports" based on Medicare data that, according to Defendants, would show that Medicare patients were acquiring blood infections such as septicemia at Prime facilities, even though Defendants well knew that the Medicare data identified patient conditions at the time of hospital admission, not hospital

1  acquired conditions.  Bush's threat was made with the full knowledge and at the direction of the

2  Individual Defendants.

3       126.    Around June 2010, Defendants went so far as to threaten to put Prime's founder

4  and Chairman, President, and current Chief Executive Officer, Dr. Reddy, and Prime's then Chief

5  Executive Officer, Lex Reddy, in jail unless Prime both accepted Defendants' contract demands

6  at Centinela Hospital Medical Center and agreed to a "neutrality agreement" for Prime's other

7  hospitals.  The threat of incarceration was made by SEIU and UHW executives to Lex Reddy

8  during a meeting in Washington, D.C. and done so at the direction of the Individual Defendants.

9  As threatened, the campaign and its attacks continued.  SEIU and UHW executives traveled

10 interstate to attend the meeting in Washington, D.C.

11      127.    Prime met with Dave Regan, at his request, in late August 2012.  During the

12 meeting, Regan demanded, on behalf of all Defendants, that Prime enter into an organizing

13 agreement with UHW, under which Prime would remain neutral or take a positive stance towards

14 Defendants while UHW organized all of Prime's healthcare workers, and even provided such an

15 agreement to Prime.  Regan threatened that if Prime did not concede to his demands, Defendants

16 would push a piece of legislation designed to hamstring Prime's business (detailed below)

17 through the California legislature.  If Prime agreed, however, Defendants would stop their

18 campaign against Prime, including a hiatus on public attacks, disparaging remarks, or

19 publications as well as not making any further complaints to governmental agencies or other

20 entities, and Defendants would get the legislation directed at Prime dropped.  Defendant Regan

21 made these demands and threats in full consultation and coordination with Defendants Henry and

22 Woodruff.

23      128.    During discussions between Defendants and Prime in September to November

24 2013, Defendants, through UHW's counsel Bruce Harland, stated to representatives of Prime that

25 Defendants would stop all corporate campaign activity only if Prime agreed to a nationwide

26 neutrality and card check agreement, effectively an agreement that would turn employees at all of

27 Prime's hospitals, including those acquired in the future, over to Defendants.  Defendants'

28 extortionate campaign would continue if Prime refused to accede to UHW's demands.  Bruce

1    Harland made these demands and threats in full consultation and coordination with the Individual

2    Defendants.

3        129.    In early July 2014, the President of the California Hospital Association, Duane

4    Dauner – who, as detailed below, was at the time working alongside Dave Regan and UHW to get

5    all CHA hospitals to enter into top-down organizing agreements with UHW – informed Prime

6    that Defendants were planning on increasing their campaign attacks against Prime and that the

7    campaign would continue unless Prime entered into the agreement.  At this time, and also as

8    detailed below, Defendant Regan was asserting publicly that Defendants had a "specific strategy"

9    for Prime, that they were going to get Prime to "heel," and that they were going to continue to be

10   public and "beat up" Prime.

11       130.    Dave Regan and Dr. Reddy also met in late July 2014, this time to discuss Prime's

12   attempted acquisition of the Daughters of Charity Health System ("DCHS"), and Regan again

13   threatened Prime's business.  Specifically, Regan stated that Prime would never get approval for

14   the sale from the California Attorney General unless it agreed to full neutrality and the agreement

15   that it forced on CHA, thereby allowing unfettered organizing of Prime's healthcare workers.

16   Regan also stated that Defendants would engage in similar conduct if Prime attempted to enter the

17   New York market.  Following the meeting, Regan took to the offensive and declared on UHW's

18   website that he had met with Dr. Reddy and that during their meeting Dr. Reddy had threatened to

19   put DCHS into bankruptcy.  Again, Defendant Regan's threats were made at the direction of, and

20   in coordination with, Defendants Henry and Woodruff.

21       **B.    Defendants Attack Prime's Affiliates**

22       131.    Around February 2010, Defendants, acting through Defendant Woodruff at CtW

23   and at the direction of Defendants Henry and Regan, began targeting Medical Properties Trust

24   ("MPT"), a publicly traded real estate investment trust that serves as Prime's landlord and/or

25   lender at several of its hospitals.  In a February 2010 letter to MPT's Board of Directors, CtW

26   falsely claimed that Prime's hospitals did not comply with California's earthquake safety laws,

27   had infection control problems, had engaged in Medicare fraud, and stood to lose millions of

28   dollars.

DLA PIPER LLP (US)
SAN FRANCISCO

-36-

COMPLAINT

132.    After receipt of CtW's correspondence, MPT conducted its own investigation into Defendants' allegations and found them to be baseless.  Prime expended time, money, and resources in dealing with Defendants' allegations that it would not otherwise have expended but for, and as a direct result of, Defendants' extortionate acts.

133.    Having not convinced Prime to concede or MPT to pressure Prime to cave to Defendants' demands, Defendants stepped up their assault on MPT for the continued purpose of pressuring Prime, this time including both the United States Securities and Exchange Commission ("SEC") and California State Senator Denise Ducheney, a long-time SEIU supporter, in their extortion campaign against Prime.

134.    In an April 2010 letter to the SEC, CtW, again at the direction of Defendants Woodruff, Regan and Henry urged the SEC to interfere with a stock offering planned by MPT by alleging again its false claims against Prime and also claiming that MPT had failed to make adequate financial disclosures regarding the alleged costs of remedying Defendants' claimed deficiencies at MPT/Prime hospitals.   In fact, MPT had made all the requisite financial disclosures.  Prime expended time, money, and resources in dealing with CtW's letter to the SEC that it would not otherwise have expended but for, and as a direct result of, Defendants' extortionate acts.

135.    During that same month, at CtW's urging, Senator Ducheney wrote to MPT and repeated the false claims that Prime hospitals were not in compliance with California's earthquake safety laws, even though publicly available data showed this not to be the case.  Again, CtW's actions were directed and coordinated by the Individual Defendants.   Prime expended time, money, and resources in dealing with Senator Ducheney's letter that it would not otherwise have expended but for, and as a direct result of, Defendants' extortionate acts.

136.    The allegations that MPT had not made the necessary disclosures and of the supposed deficiencies at the Prime hospitals, including the above-mentioned seismic compliance allegations, were published on the Internet and in print media to the general public, including potential Prime patients.  The purpose of the publication was to create doubt about the integrity of Prime's facilities and create conflict between Prime on the one hand, and MPT and Prime's

1    customers on the other hand.  Indeed, patients would not know whether MPT complied with the

2    law in this regard or whether Prime's facilities were seismically safe, but would surely have

3    concern over receiving treatment at a facility that he or she has "heard" fails to comply with the

4    law.

5          **C.    Defendants Publish False and Disparaging "Studies" Attacking Prime and
6          Rely On Those "Studies" to Advance Their Campaign**

7          137.    In late 2010, in furtherance of Defendants' objective to either unionize Prime or

8    drive it from the market, Defendants prepared and published a "study" attacking Prime and its

9    hospitals entitled Septicemia at Prime Hospitals.  In this propaganda piece, Defendants alleged

10   that, based on their analysis of 2008 Medicare data, Prime's hospitals experienced unusually high

11   rates of septicemia, a serious and often life-threatening blood infection, as either a result of

12   pervasive patient care and quality problems or that those hospitals were engaged in Medicare

13   fraud by "upcoding" for cases of septicemia (i.e., that a patient who did not have septicemia was

14   nevertheless coded for septicemia so that the hospital would receive a higher Medicare

15   reimbursement).  These allegations against Prime were false.

16         138.    In an effort to bring the full power of the Federal and State governments to bear on

17   Prime, and to force Prime to spend time and money playing defense, Defendants forwarded the

18   information contained in its septicemia propaganda piece to, among others, the California

19   Attorney General, members of the U.S. House of Representatives, members of the California

20   Senate and Assembly, California regulatory officials, and independent accreditation agencies.

21   Defendants contacted the government for the sole purpose of getting it to initiate investigations

22   into Prime that would disrupt Prime's business affairs, harm its reputation, and cause Prime to

23   expend significant time, money, and resources solely for the purpose of responding to any

24   investigation and in furthering Defendants' goals of forcing Prime to unionize or leave the

25   market.  Prime expended time, money, and resources in dealing with Defendants' sham lobbying

26   that it would not otherwise have expended but for, and as a direct result of, Defendants'

27   extortionate acts.  As discussed in detail below, the fact that the investigation by the California

28   Department of Public Health ("CDPH"), a quasi-judicial body, of Prime and its hospitals initiated

1   at Defendants' behest was closed after finding no wrong-doing evidences Defendants' sham

2   lobbying.

3       139.    In January 2011, Defendants published another "study" attacking Prime – Care

4   and Coding at Prime Healthcare Services ("Care and Coding") – this time based on their

5   purported analysis of 2009 Medicare data.  Care and Coding included again the same false and

6   misleading septicemia allegations as its original propaganda article, and also included additional,

7   equally false claims regarding malnutrition at Prime's hospitals (i.e., that Prime's hospitals had

8   extraordinarily high rates of malnutrition because of either extremely poor patient care or

9   Medicare fraud).  *Care and Coding at Prime Healthcare Services: Analysis by SEIU-UHW* at 1

10  (Jan. 2011), http://www.seiu-uhw.org/files/2011/10/Care-and-Coding-at-Prime_050311.pdf.  The

11  publication of Care and Coding coincided with a series of articles published at Defendants'

12  urging by California Watch, a purportedly independent investigative media organization,

13  attacking Prime for the septicemia and malnutrition issues raised in Defendants' propaganda.  *See*

14  Lance Williams et al., *Hospital Chain, Already Under Scrutiny, Reports High Malnutrition Rates*,

15  California Watch, Feb. 19, 2011.

16      140.    Defendants' false Septicemia at Prime Hospitals and Care and Coding "studies"

17  are both available for download on the portion of the UHW's website dedicated to its attacks

18  against Prime – originally titled "Eye on Prime Healthcare" and now called "Holding Prime

19  Healthcare Accountable."  *See* http://uhw.seiu.org/page/s/Prime.

20      141.    In furtherance of their conspiracy, Defendants, along with their agents and

21  surrogates, routinely cite to the "studies" as "independent" evidence of Prime's alleged poor

22  performance in the market.   In fact, Defendants inundated Prime's customers, prospective

23  customers, physicians, hospital boards of directors, government officials, public interest

24  organizations, and the public at large with the highly disparaging "studies" attacking Prime.

25      142.    For example, beginning in late February 2011, Defendants sent flyers to Prime's

26  current and prospective patients attacking Prime's hospitals by alleging that Prime suffered from

27  abnormally high rates of blood poisoning (septicemia) among its patients.  Not satisfied with its

28  direct mail initiative, UHW also employed the use of phone banks to scare elderly patients into

1  believing that these patients had already, or would in the future obtain blood infections when they

2  sought care at a Prime hospital. These same callers also alleged that Prime's hospitals had

3  improperly disclosed their private medical information. UHW's actions were done at the

4  direction of the Individual Defendants.

5       143. Defendants' actions in this regard were done for the dual purpose of both injuring

6  Prime and benefitting the Defendants because some of these patients sought treatment elsewhere

7  including union-dominated hospitals. Prime expended time, money, and resources in dealing

8  with Defendants' conduct toward Prime's current and prospective customers that it would not

9  otherwise have expended but for, and as a direct result of, Defendants' extortionate acts.

10       144. On March 16, 2011, at Defendants' urging, a reporter from California Watch,

11  Lance Williams, sent Prime an email asking whether Prime wanted to comment on the request by

12  California State Senator Ed Hernandez ("Sen. Hernandez") to the CDPH to investigate the

13  septicemia and malnutrition rates at Prime's hospitals "reported" by Defendants. Sen. Hernandez

14  has a close relationship with and financial ties to Defendants and initiated the CDPH request at

15  the Defendants' urging.

16       145. On April 12, 2011, Defendants sent a letter to Prime's Centinela Hospital's Board

17  of Directors. The letter claimed that California Watch published an "independent" analysis of

18  Prime's Medicare bills and "their exposé . . . revealed extraordinarily high rates of septicemia and

19  malnutrition or possibly a systematic practice to collect higher reimbursements under Medicare."

20  The letter further claimed that, in 2009, eight of the nine hospitals in California with the highest

21  malnutrition rates were operated by Prime – the same false and baseless allegations as those in

22  Defendants' "studies."

23       146. Of course, the "studies" created and relied on by Defendants and their allies are

24  not what they seem. Rather, they are contrived propaganda pieces organized by Defendants to

25  disparage Prime and weaken its position as a competitor in the market. Defendants created the

26  appearance of "evidence" against Prime and then cited to their own creation in order to

27  demonstrate the credibility of their accusations.

28       147. The fraudulent and deceptive nature of Defendants' "studies" is illustrated by a

June 2011 report on sepsis by the Center for Disease Control and Prevention ("CDC").  *See Margaret Jean Hall et al., Inpatient Care for Septicemia or Sepsis:  A Challenge for Patients and Hospitals*, NCHS Data Brief, No. 62, June 2011.  The CDC report observes that sepsis has become a substantial and growing problem in hospitals, and that the proper course of treatment is for hospitals to aggressively treat patients when sepsis is suspected, even before sepsis has been diagnosed in a patient.

148.  The approach recommended by the CDC is precisely one that Prime had adopted with great success, leading to a substantial decrease in mortality from sepsis.  Yet, once again placing the conspiracy's interests ahead of patient health, Defendants have extensively criticized Prime for engaging in precisely the course of conduct recommended by the CDC.  The attack would be completely irrational unless one understands that it has nothing to do with healthcare and everything to do with damaging Prime and thereby enriching the conspirators.

149.  In addition, on or about September 30, 2011, CDPH officially withdrew its charges and ceased its investigations related to the diagnosis and coding of septicemia and malnutrition at Prime hospitals that were initiated by CDPH in response to Defendants' baseless allegations.  Prime expended time, money, and resources in dealing with the CDPH investigation that it would not otherwise have expended but for, and as a direct result of, Defendants' extortionate acts.

150.  CDPH's findings were consistent with those of the Joint Committee and the Healthcare Facilities Accreditation Program ("HFAP"), the nation's largest and second largest Medicare accreditation organizations, respectively.  The Joint Committee and HFAP conducted surveys at ten Prime hospitals in response to Defendants' and Sen. Hernandez's allegations regarding septicemia and found no evidence to support those allegations.  Prime expended time, money, and resources in dealing with The Joint Committee and HFAP inquiries that it would not otherwise have expended but for, and as a direct result of, Defendants' extortionate acts.

**D.  Defendants Interfere with the Growth of Prime's Business**

151.  An early May 2010 "Strategic Campaigns" workshop held at the University of California at Berkeley Labor Center – a workshop aimed at teaching and equipping union leaders with the "tools" to conduct a corporate campaign against a target employer – illustrates how

Defendants were committed not to achieving any legitimate labor objective at Prime, but rather to destroying Prime to advance the objectives of the conspiracy. At that conference, a UHW representative gave a presentation to the attendees outlining Defendants' planned attacks against Prime as an example of how to plan for and carry out such a campaign. Blocking Prime from acquiring additional acquisitions was listed as one of the primary goals of the campaign. And that is exactly what Defendants have done as part of their unlawful attacks on Prime.

152. Defendants followed the initial septicemia-related attacks with their first attempt to prevent Prime from acquiring additional hospitals in California. These efforts included coordinated messages from Defendants and their allies to California State officials to stop issuing licenses to Prime until any investigations of Prime – investigations prompted by Defendants – were complete. In August 2010 then California State Senator Elaine Alquist, at the time the Chair of the Senate Health Committee sent a letter to CDPH citing Defendants' "studies" and demanding that CDPH initiate an investigation of Prime and withhold any additional hospital licenses to Prime until any investigations of Prime are completed. Then California Assemblyman Bill Monning (now a California State Senator), at the time the Chair of the Assembly Health Committee, sent a substantively identical demand letter to CDPH in September 2010. And, one month later, SEIU California sent a letter to CDPH relying on the letters from Senator Alquist and Assemblyman Monning, which themselves relied on Defendants' allegations of wrongdoing, and demanded that CDPH deny any new hospital licenses to Prime. Defendants also reached out directly to CDPH following Prime's November 2010 acquisition of Alvarado Hospital in San Diego, California, falsely alleging that Prime was in violation of California hospital licensing law and demanding that CDPH initiate legal action against Prime and prohibit Prime from operating the hospital.

153. As detailed above, CDPH did launch an investigation of Prime based on Defendants' and their allies' allegations and demands. Prime expended time, money, and resources in dealing with Defendants' and their allies' demands to these California State officials that it would not otherwise have expended but for, and as a direct result of, Defendants' extortionate acts.

154.    In 2011, Defendants sought, and were ultimately successful in blocking another Prime acquisition.  With the assistance of Sen. Hernandez, Defendants campaigned to block the bankruptcy sale of Victor Valley Community Hospital ("VVCH") to Prime.  Per a UHW press release following the denial of the sale to Prime, Defendants "loudly and publicly opposed the sale at every turn" and ultimately "helped to stop Prime again."

155.    VVCH, one of only three hospitals in the geographically isolated High Desert area (and the only non-profit hospital in that area), declared bankruptcy in September 2010.  Riverside, California-based for-profit KPC Global outbid Prime with a $37 million bid for VVCH ($2 million higher than the Foundation's bid) during a November 2010 bankruptcy auction.  The sale to KPC Global was approved by the bankruptcy court and then California Attorney General Jerry Brown, but KPC failed to finalize the acquisition because it was not able to line up financing and that deal fell apart in May 2011, leaving VVCH on the brink of collapse.  Prime, acting through the non-profit Prime Healthcare Foundation, stepped in and agreed to buy VVCH for its previous bid of $35 million and to keep VVCH as a non-profit hospital following the acquisition.

156.    VVCH's Board of Directors approved of the sale and accepted Prime's offer, but Defendants took immediate action to prevent the sale from actually taking place.  For example, during proceedings before the bankruptcy court for its approval of the sale of VVCH to Prime, Defendants threatened that Prime would never get the hospital.   The bankruptcy court nevertheless approved the sale and final approval fell to now California Attorney General Kamala Harris.

157.    Officials within the Office of the Attorney General represented that the sale would be approved.  Prime is informed and believes that at least two Deputy Attorney Generals who were responsible for the acquisition process of VVCH represented that the acquisition had been conditionally approved.  Moreover, Prime is informed and believes that representatives from VVCH, including at least one Board Member and its attorney, were told by at least one Deputy Attorney General that the sales to Prime had been approved at their level and was recommended to be approved by the Attorney General. In addition, an expert hired by the Attorney General recommended approval of the sale upon certain conditions to which the Foundation had agreed.

158.    On August 17, 2011, the Office of the Attorney General held a public hearing on the sale of VVCH to Prime.  In the days leading up the hearing, Dave Regan, in coordination with and at the direction of Defendants Woodruff and Henry, personally corresponded directly with the Office of the Attorney General about Defendants' plans to oppose the sale at the hearing; the Attorney General accommodated with a larger meeting space.  The Chief Executive Officer of VVCH pled for the Attorney General to approve the sale to the Foundation and stated that without a quick approval she would be forced to start closing VVCH.  Other attendees also spoke out in favor of the sale and the need to keep the hospital open.

159.    Although not stated by the Attorney General at the time of her decision, it was later reported that:

> A major consideration [for the Attorney General] was that Victor Valley Community was founded and set up as a non-profit institution.  The attorney general's office had moved to ensure that the High Desert preserve at least one non-profit hospital in an area with a multiplicity of for-profit medical centers, including one already owned by [Dr.] Reddy, Desert Valley Hospital.

Venturi, *Chadhuri to Purchase Victorville Hospital*, San Bernardino County Sentinel, July 7, 2012,  http://sbsentinel.com/2012/07/chaudhuri-to-purchase-victorville-hospital/.    The sale of VVCH to Prime would have kept the hospital as a non-profit.

160.    Despite the other approvals, expert recommendation, the fact that the hospital would retain its non-profit status, and public support for VVCH's sale to Prime and the substantial likelihood that a denial of the sale would force VVCH to shut its doors, on September 20, 2011, the Attorney General denied the sale.  The Attorney General did not provide any specific reason for the denial, stating only generally that it was not in the public's best interest. The Attorney General would not have denied the sale to Prime but for Defendants' urging.

161.    Based on public records available on the website for the Office of the Attorney General, her denial of the sale of VVCH to Prime was the first and only time that she has denied the sale of a California non-profit hospital.  In all other instances, including the ultimate sale of VVCH to KPC Global, which converted VVCH to a for-profit facility unlike the sale to Prime which would have kept VVCH as a non-profit hospital, she approved such sales.

162.    In an attempt to keep VVCH open following the denial of the sale to Prime, VVCH sought to enter into a stop-gap financing plan and consulting agreement with Prime.  The financing and consulting plan was tentatively approved by the bankruptcy court on October 20, 2011, and backed by several California healthcare agencies.  Despite the support for the plan and with nothing in the law that requires State approval for such temporary financing plans, on October 28, the Attorney General, at Defendants' urging, filed a request for a temporary restraining order to prevent VVCH from moving forward with the financing plan and consulting agreement.  As with the Attorney General's initial decision to deny the sale of VVCH to Prime, the Attorney General did not explain her opposition to the financing and consulting plan.  Indeed, when the judge directly asked the Attorney General to explain her opposition, a State attorney declined to offer any explanation whatsoever.  Notwithstanding her silence, the Attorney General would not have taken the position in the litigation but for Defendants' urging.

163.    On October 31, 2011, the San Bernardino County Superior Court judge hearing the Attorney General's request for a temporary restraining order denied the Attorney General's attempt to prevent the financing and consulting agreement between VVCH and Prime.  And that same day, the bankruptcy court approved the financing and consulting plan.

164.    In November 2011, not long after the Attorney General's denial of the sale, KPC Global, the same for profit buyer that had previously failed to close on the sale, thus threatening VVCH's very existence, reappeared on the scene.  KPC Global offered to buy VVCH for $33.8 million, $1.2 million less than Prime's offer, and $3.2 million less than KPC Global's initial, accepted, and approved offer from a year earlier.  Under the proposed deal, KPC Global would convert VVCH to a for-profit hospital.

165.    On June 27, 2012, the federal bankruptcy judge approved the sale of VVCH to KPC Global over Prime's objections.  Following the bankruptcy's judge's decision, Defendants publicly took credit for thwarting the acquisition and helping to "stop Prime again."

166.    Notwithstanding the previously stated desire of the Office of the Attorney General to keep VVCH as a non-profit hospital, the only one in the High Desert region, the Attorney General approved the sale of VVCH to KPC Global on August 31, 2012 with no objections set

forth by Defendants.  KPC Global completed its purchase of VVCH on October 16, 2012 and converted it to a for-profit institution.  KPC Global changed the hospital's name to Victor Valley Global Medical Center in July 2013.

167.    The repercussions of the Attorney General's decision are still being felt in the High Desert.  In addition to denying the sale of VVCH to a non-profit as proposed by Prime and allowing a for profit to acquire it, the community will lose millions of dollars as a result of that decision.  VVCH is set to be provided over $80 Million in hospital provider fees from the federal government for its treatment of Medicare patients while it was a non-profit.  Instead of the money remaining within the community to treat the poor and underserved population in the High Desert, that money will now go into the coffers of its for profit parent company.  In short, the Attorney General's decision resulted in an $80 Million windfall for the KPC Group, the for-profit parent of KPC Global, at the expense of the local community.

168.    In another example, in 2013, Defendants worked to block the sale of several hospitals to Prime, this time in Kansas.  These hospitals included Providence Hospital, St. John's Hospital, and Providence Place Hospital.  Specifically, Defendants sent Kim Davis, a member of the UHW bargaining unit at Prime's Garden Grove Hospital and a "Political Action Leader" for the union, to Leavenworth, Kansas to testify at a March 27, 2013 hearing regarding the proposed sale of those hospitals to Prime for the purpose of blocking it.

169.    The majority of Davis' testimony related to the subject matter of the attacks that Defendants, through UHW, were undertaking against Prime.  By way of example, Davis testified: "I know that you have read the press reports about how Prime is under federal investigation for billing Medicare seniors for incredibly high rates of blood infections, severe malnutrition, and brain disorders, and other high paying diagnoses.  And I know you read about federal investigations that Prime faces about intentionally violating patients' privacy."  Tr. of Public Hearing re Proposed Sale of Providence Hospital, St. John Hospital and Providence Place to Prime Healthcare Services at 67:12-19, Mar. 27, 2013.

170.    In January 2014, three UHW-representatives, at the direction of the Individual Defendants, testified against Prime at the public hearing on Prime's purchase of St. Mary's

1   Hospital in New Jersey before the New Jersey State Health Planning Board.   The UHW

2   representatives – one is a UHW Research Director and the other two are employees at Prime's

3   Centinela Hospital on the UHW bargaining team – each testified about Defendants' ginned-up

4   allegations of wrongdoing by Prime in an attempt to convince the Health Planning Board to deny

5   the sale to Prime.

6          171.    And in July of this year, Defendants initiated yet another assault on Prime and are

7   attempting to thwart Prime's purchase of the Daughters of Charity Health System, which consists

8   of six acute care hospitals in California.  Defendants, acting through UHW and at the direction of

9   the Individual Defendants, have taken several steps to prevent Prime from consummating the

10  transaction.

11         172.    Around July 10, 2014, UHW published a separate section on its website dedicated

12  to interfering with Prime's pending bid to purchase DCHS.  Calling Prime's attempted acquisition

13  a "takeover," UHW's website is a call to action asking members and others to "speak up" to

14  support a sale to a buyer other than Prime.

15         173.    As an alternative to Prime, Defendants are pushing Blue Wolf Capital Partners

16  LLC, a New York City based private equity firm with zero experience operating hospitals but a

17  friendly relationship with Defendants, as a bidder for DCHS.  Defendants are willing to impose

18  upon their membership significant pay cuts associated with Blue Wolf Capital's acquisition to

19  maintain their control and dues revenue which would not occur if Prime acquired DCHS; further

20  evidence that Defendants are attempting to both injure Prime and enrich themselves in the process

21  rather than pursuing any legitimate objective.

22         174.    During a July 24, 2014, meeting between Dave Regan and Dr. Reddy regarding

23  Prime's attempted acquisition of DCHS and Defendants efforts to prevent that acquisition, Regan

24  threatened that Prime would never get approval from the California Attorney General unless it

25  agreed to full neutrality and the Code of Conduct which, as discussed below, Defendants forced

26  upon the California Hospital Association, thereby allowing unfettered organizing of Prime's

27  healthcare workers.  During that meeting, Regan also threatened that Defendants would engage in

28  similar extortionate conduct if Prime attempted to enter the New York market.  A few days later,

1    Defendants resumed their attacks on Prime with Regan publicizing his closed-door meeting with

2    Dr. Reddy on UHW's website in an attempt to incite public outcry against the sale of DCHS to

3    Prime.

4        175.    In another conversation around the same time, Dave Regan stated to a high-

5    ranking official at DCHS that Prime would never get approval from the California Attorney

6    General for the acquisition.

7        176.    Perhaps not surprisingly given Regan's "predictions," on July 29, 2014, UHW

8    proposed a resolution at the California Federation of Labor's convention that called for the

9    California Attorney General to stop the sale of any hospital in California to Prime unless and until

10   any investigations of Prime for allegedly overcharging Medicare – allegations based on

11   Defendants' "studies" – are completed.  The resolution passed and was adopted.

12       **E.    Defendants Manipulate the Media**

13       177.    Defendants' efforts to interfere with and block Prime's hospital acquisitions were

14   not a substitute for other aspects of the campaign.  Rather, continuing to act from the same

15   playbook published by SEIU and employed in other campaigns, all of Defendants' campaign

16   tactics, including enlisting the services of California Watch to serve as their ally and

17   spokesperson, are designed to work hand-in-hand to saturate the market with negative news about

18   Prime.   Prime expended time, money, and resources in dealing with California Watch's

19   publications that it would not otherwise have expended but for, and as a direct result of,

20   Defendants' extortionate acts.

21       178.    Beginning on or about October 11, 2010, California Watch published numerous

22   articles attacking Prime on the baseless issues created by Defendants and dedicated an entire

23   section of its website – "Decoding Prime" – to furthering Defendants' campaign to eliminate

24   Prime as a competitive threat.  Those articles continue to be published to this day.

25       179.    By way of example, in or around November 2011, California Watch lobbed four

26   separate media attacks against Prime in a single day regarding its coding and Medicare

27   reimbursement.  *See, e.g.*, Lance Williams, Stephen K. Doig, Christina Jewett, *Heart Failure*

28   *Cases Surge Among Prime Hospital's Medicare Patients*; *Patient's Case Illustrates Bonus*

1  *Payment for Heart Failure*; *Chainwide, Prime has High Heart Failure Rates*; and *How We*

2  *Calculated Hospitals' Heart Failure Rates*, California Watch, Nov. 27, 2011. In all four of these

3  articles, California Watch alleged that Prime was engaged in upcoding of acute heart failure

4  incidents to obtain enhanced Medicare payments, the same types of allegations that Defendants

5  created in their "studies." California Watch's unfounded attacks have continued to date.

6      180. The deceptive nature of California Watch's health care reporting is apparent. The

7  statements and innuendo contained in the California Watch "reports" have been shown to be false

8  and deceptive and persons allegedly quoted in them have testified that they were misquoted and

9  mischaracterized. The sheer length of California Watch's reporting on Prime coupled with the

10  lack of any findings of any wrongdoing exposes the outlet for what it is: a delegate for the

11  conspiracy.

12      181. During this time, California Watch has not published a single article critical of

13  unionized hospitals, such as Kaiser Permanente, despite myriad opportunities that beg for such

14  "investigative reporting" on healthcare related issues or any other California hospital or hospital

15  operating company. No other hospital or operating company shares the notorious distinction of

16  having its own dedicated section on California Watch's website.

17      182. Not coincidentally, at the same time as Defendants, including through California

18  Watch and Sen. Hernandez, were disguising their actions as consumer advocacy, they failed to

19  turn the same alleged critical eye on union-dominated Kaiser Permanente. Tellingly, the

20  "studies" attacking Prime created and circulated by Defendants and their allies omit reference to

21  Kaiser Permanente, which, for example, had the highest rates for malnutrition of any hospital

22  studied as part of a California healthcare agency study in 2009.

23      **F.    Defendants' Sham Lobbying and Litigation**

24      183. Defendants have also manipulated the state and federal governments to

25  specifically attack Prime and its superior business model, including with legislative efforts to

26  directly restrict Prime's ability to grow its business. For example, in early 2011, Defendants

27  worked with Sen. Hernandez to champion California Senate Bill 408 ("SB 408"), a bill that

28  would require healthcare facilities to obtain a new license if the facility experienced an ownership

change or major change in ownership interest.  SB 408 was prepared in retaliation for Prime's

November 2010 acquisition of Alvarado Hospital in California and designed for no purpose other

than to restrict Prime's ability to acquire additional hospitals.  *See, e.g.*, Prime Healthcare Should

be Denied New Hospital Licenses Until Federal, State Investigations into Extraordinarily High

Septicemia, Malnutrition Rates and Risk to Patients Are Complete, SEIU-UHW, http://www.seiu-

uhw.org/archives/1306.

184.    Following SB 408 passing in the legislature, Defendants and their allies began a

campaign to convince California Governor Jerry Brown to sign SB 408 into law.  *See, e.g.*, SEIU

California State Council petition, http://seiuca.seiu.org/page/signup/sb408-hospitals; California

Labor Federation petition, http://act.aflcio.org/c/130/p/dia/action/public/?action_KEY=2900.

Governor Brown vetoed SB 408 on October 7, 2011.

185.    Defendants' involvement in SB 408 and that its purpose was directed solely at

Prime, is further clarified by statements made at a September 24, 2011 Executive Board meeting

of another SEIU healthcare local shortly before Governor Brown vetoed the bill in October.  The

2011 Legislative Report presented by SEIU California at that Executive Board meeting states

clearly that SB 408 was sponsored by SEIU.  And the Nurse Alliance Report presented at that

Executive Board meeting by another SEIU local that represents California nurses provides the

following:  "SB 408 (the Prime bill):  passed as well.  That is to prevent Prim Ready [sic.]

[President and CEO of Prime] from purchasing hospitals, using the previous owners license and

providing substandard care.  He would have to apply for a new license with each purchase.  It's

huge for us, especially UHW!"  *See* Committee and Industry Reports: Nurses Alliance Legislative

Update 9/8/11, http://www.seiu521.org/files/2011/05/2011eboardSept24.pdf.

186.    The sham lobbying continued.  In February 2012, Sen. Hernandez held a joint

hearing of the California State and Assembly Health Committees that, according to Defendants,

"spawned a bill (SB 1285) that would limit [Prime's] exploitative practices."  *See* Press Release,

SEIU-UHW, *Federal Judge Rejects Prime Healthcare's Objections, Approves New Buyer to*

*Purchase Victor Valley Community Hospital* (June 29, 2012), http://www.seiu-

uhw.org/archives/9878.  The Chairman of the California Assembly Health Committee, Dr.

1    Richard Pan ("Assemblyman Pan"), also has close connections with SEIU and UHW and has

2    worked alongside Defendants during their campaign against Prime.

3         187.   In February 2012, Sen. Hernandez, in conjunction with Defendants, proposed SB

4    1285, a bill that would require hospitals with an out-of-network emergency utilization rate of

5    greater than fifty percent to adjust charges for out-of-network emergency care so that expected

6    reimbursement does not exceed the greater of:  (1) the amount the hospital could reasonably

7    expect Medicare to pay for the care; or (2) a good faith and reasonable estimate of the actual cost

8    of providing the necessary pre-stabilization care.  Defendants'/Hernandez's SB 1285 does not

9    apply in situations where there is a contract between the hospital and a health plan or health

10   insurer that would otherwise govern the payment, i.e., it only applies to Prime's business model.

11        188.   That SB 1285 was designed by Defendants specifically to target Prime is made

12   even more clear by the comments to the bill, many of which directly reference Prime and its

13   business plan as the bill's target.  The comments include a recitation of the various California

14   Watch articles that relied on Defendants' "studies" and their other attacks against Prime.

15   Defendants included a statement in support of SB 1285 that also showed that Prime was the target

16   of the legislation.

17        189.   On February 24, 2012, Sen. Hernandez and Assemblyman Pan held a Joint

18   Informational Hearing of the Senate and Assembly Health Committees regarding how private

19   insurers and health plans and the major government healthcare programs reimburse/pay

20   contracted and non-contracted hospitals for providing healthcare services, i.e., the subject matter

21   of SB 1285.  The hearing was really planned, however, to serve as a platform for Defendants to

22   target Prime.

23        190.   As planned by Sen. Hernandez, Assemblyman Pan, and Defendants, the hearing

24   very quickly turned into an all-out attack on Prime and its business model as the impetus for SB

25   1285.  Indeed, entire sections of the hearing were devoted to furthering Defendants' attacks

26   against Prime and its business model although entirely unrelated to the alleged purpose of the

27   hearing.  The testimony and questioning at the hearing were regularly steered to focus on the

28   same types of allegations against Prime as detailed in Defendants' "studies" and the various

DLA PIPER LLP (US)
SAN FRANCISCO

-51-

1  California Watch reports.  There was even testimony from a woman who was the subject of one

2  such California Watch article disparaging Prime.

3        191.   In addition, a representative from Defendants testified in favor of SB 1285 and

4  against Prime at the hearing.  That representative raised the same meritless allegations against

5  Prime detailed above (e.g., upcoding, overcharging, septicemia, and malnutrition) that Defendants

6  have consistently used to attack Prime and advance the interests of the conspiracy.   Indeed,

7  Defendants' representative testified about nothing other than Prime and relied exclusively on the

8  baseless assertions against Prime created by the conspiracy, even giving a presentation with

9  charts using the data from the Defendants' "studies."

10        192.   In late August 2012, while SB 1285 was bouncing around the California

11  Assembly, Dave Regan, in coordination and at the direction of Defendants Henry and Woodruff,

12  reached out to Prime to schedule a meeting.  That meeting took place on August 23, 2012.

13  During the meeting, Regan demanded that Prime enter into an organizing agreement with

14  Defendants, whereby Prime would remain neutral or take a positive stance towards UHW while

15  the union organized all of Prime's healthcare workers, and even provided such an agreement to

16  Prime.  Regan threatened that if Prime did not capitulate to his demands, Defendants would push

17  the "Prime Bill," i.e., SB 1285, through the California legislature in a matter of weeks.  If Prime

18  agreed, however, Defendants would stop their campaign against Prime, including a hiatus on

19  public attacks, disparaging remarks, or publications as well as not making any further complaints

20  to governmental agencies or other entities, and Defendants would get the legislation directed at

21  Prime dropped.  Prime refused to capitulate to Defendants' demands.

22        193.   The very next day, on August 24, 2012, Sen. Hernandez took an unrelated bill, SB

23  359, and amended it by replacing the original text entirely with the previously proposed language

24  from SB 1285.  As threatened by Dave Regan, within a week the newly amended SB 359

25  targeting Prime had passed through Assemblyman Pan's Health Committee and was also passed

26  on the Assembly and Senate Floors.  It was vetoed by the Governor of California on September

27  30, 2012.

28        194.   As made clear by Prime's meeting with Dave Regan and his proposal, Defendants

did not care about the final outcome of the legislation and whether it was ever passed into law. Defendants were willing to pull the legislation immediately if Prime capitulated to the conspiracy. Instead, Defendants were interested in and used the threat of the implementation of the legislation in an attempt to accomplish the conspiracy's goals:   forcing Prime to cede control of its operations and turn over its workforce or exit the market.  SB 1285 / SB 359 was nothing more than a bargaining chip to force Prime to enter into essentially the same deal as did Columbia/HCA and Tenet when those companies finally capitulated to Defendants' attacks.

195.    Defendants have similarly manipulated the offices of the NLRB and caused Prime to expend its time, money, and resources defending against objectively baseless litigation initiated solely to interfere with Prime's business operations and damage Prime's business reputation and goodwill.  Over the past three years, UHW, in coordination with and at the direction of the Individual Defendants, has filed more than two dozen unfair labor practice charges at the NLRB against Prime and its hospitals.  Most of those have not even survived the investigation stage.

196.    The NLRB has a statutory mandate to pursue, and issue a Complaint for, any charge that makes a *prima facie* showing that an unfair labor practice has been committed.  The NLRB did not, however, issue a Complaint on the twenty charges that were either withdrawn by UHW or dismissed outright by the NLRB.  Those charges were so frivolous that UHW was not able to satisfy even the NLRB's low threshold for moving a case forward.

197.    Prime expended time, money, and resources in dealing with Defendants' sham litigation and lobbying that it would not otherwise have expended but for, and as a direct result of, Defendants' extortionate acts.

**G.    Defendants Coordinate Pressure To Have Prime's Awards Rescinded.**

198.    In 2013, Defendants, through their proxies Sen. Hernandez and Assemblyman Pan, wrote to the President and Chief Executive Officer of Truven Health Analytics, to pressure Truven to rescind its awards to Prime's Desert Valley Hospital from 2012 and 2013 claiming that the awards were "so at odds with the company's well-documented reputation and record here in California."  In its initial response in September 2013, Truven noted that it has "rescinded awards based on admission of guilt, sanctions and convictions of wrongdoing" and that "none of these

1  circumstances is yet present with Prime Health Services."

2      199.  Undeterred by Truven's response, Sen. Hernandez, Assemblyman Pan, and

3  Defendants' continued with their pressure until Truven ultimately succumbed and rescinded

4  Desert Valley Hospital's awards in February 2014.  Defendants and their proxies Sen. Hernandez

5  and Assemblyman Pan were not satisfied with the revocation of these two awards and again wrote

6  to Truven in May 2014 pressuring it to strip three other Prime Hospitals in California (Garden

7  Grove Hospital Medical Center, Alvarado Hospital Medical Center, and Shasta Regional Medical

8  Center) of previous "100 Top Hospitals" accolades earned by those facilities.  Sen. Hernandez

9  and Assemblyman Pan additionally called upon Truven to rescind its "Top 15 Health System"

10  award given to Prime in 2013.  These efforts continue.  Prime expended time, money, and

11  resources in dealing with Defendants' attacks that it would not otherwise have expended but for,

12  and as a direct result of, Defendants' extortionate acts.

13      200.  Upon information and belief, Defendants' conduct as described above was carried

14  out through the use of interstate facilities.

15  **H.    Defendants Affirm Their Campaign Against Prime By Pressuring The**
   **California Hospital Association**

16

17      201.  Defendants' extortion campaign against Prime also is highlighted through their

18  efforts to force the California Hospital Association to agree to Defendants' unionization demands

19  and force those demands down on its members.  The CHA, based in Sacramento, California, is a

20  hospital trade association that represents the interests of California hospitals and health systems.

21  Defendants' own statements and admissions in their efforts against the CHA show that this effort

22  is yet another stepping stone in their campaign against Prime.

23      202.  In 2012, UHW threatened to pursue ballot initiatives for two pieces of legislation

24  that seriously threatened the viability of California hospitals that were not Defendants' allies.

25  One, the Fair Healthcare Pricing Act of 2012 would have prohibited hospitals from charging more

26  than 25% above actual costs of patient care.  The second, the Charity Care Act of 2012, would

27  have required nonprofit hospitals to provide a minimum level of charity care, set at 5% of patient

28  revenue.

203.    The objective of these measures was to threaten serious financial risk to non-union hospitals unless they accepted Defendants' demands.   Specifically, Defendants drafted the initiatives in a manner that they would not have any financial impact on union-dominated healthcare providers Kaiser Permanente and Dignity Health (the former CHW that caved to Defendants' campaign).   The Los Angeles Times exposed Defendants' self-interest when it published an article noting that Kaiser Permanente and Dignity Health would be exempt from the ballot initiatives' restrictions.   Michael J. Mishak, *Hospitals targeted by union proposals*, L.A. Times, Mar. 10, 2012, at AA-1.

204.    The CHA immediately entered into discussions with UHW regarding terms upon which the initiatives would be withdrawn.   Despite UHW having spent millions of dollars in support of the legislation, it withdrew the bills when the CHA agreed to grant UHW significant input in the decision-making authority of the signatory hospitals.   CHA also agreed that it would facilitate meetings between UHW and its non-union member hospitals, such as Prime, to discuss the negotiation of "code of conduct" agreements, i.e., neutrality agreements.

205.    The CHA-UHW agreement did not lead to a significant boon in union membership as Defendants planned nor did it lead to the execution of any new neutrality agreements. According to Dave Regan, the agreement failed because "it did not have an enforcement mechanism." *SEIU-UHW's Dave Regan Discusses Secret Deal with California Hospital Ass'n*, YouTube (June 2, 2014), https://www.youtube.com/watch?v=Le3Aezp2mhE.

206.    Dissatisfied with the 2012 agreement, UHW began negotiations for a new agreement with CHA in 2013.   UHW's goal for the new negotiations was to impose a genuine cultural transformation within the hospital community workforce and its relations with employers.   The "cultural transformation" sought was nothing other than to force non-union healthcare providers to accept the conspiracy's business model.

207.    Just as it had done in 2012, UHW again used the threat of two ballot initiatives to pressure CHA:  (a) the Fair Healthcare Pricing Act Initiative of 2014 ("FHPA 2014") and (b) the Charitable Hospital Executive Compensation Act Initiative of 2014 ("CHECA").   Once again, FHPA 2014 sought to limit private hospitals' gross charges for services to 25% over costs.

1  CHECA imposed a cap on compensation and severance packages for executives and other

2  employees of nonprofit hospitals and affiliated groups; CHECA also required nonprofit hospital

3  and affiliated groups to publicly disclose compensation and severance packages for highest paid

4  executives and other employees each year.  Assemblyman Pan endorsed both ballot initiatives.

5       208.   UHW also sought to place pressure directly on hospital officials by falsely

6  accusing them of fiduciary breaches under state law and asking that the California Attorney

7  General undertake an investigation in that regard.

8       209.   Again, immediately following the announcement of the ballot initiatives, Dave

9  Regan reached out to CHA and stated that if CHA ceded to his demands, UHW would drop the

10  ballot initiatives.  Prime made it clear to CHA that it opposed the proposed agreement with UHW.

11       210.   On May 5, 2014, CHA and UHW reached two agreements – a Code of Conduct

12  and a Memorandum of Understanding ("MOU").  Through the MOU, the parties agreed to the

13  establishment of a $100 million joint advocacy fund to "drive improvements to the healthcare

14  delivery system."  CA Hospitals, *SEIU-UHW Reach Agreement to Improve Healthcare, Create*

15  *New Model of Labor Relations*, Reuters, May 6, 2014.  The CHA agreed to contribute $80 million

16  to the fund, while SEIU agreed to contribute $20 million.  Nonetheless, decision-making under

17  the MOU is 50/50, meaning that UHW has disproportionate veto power as to how the money

18  would be spent.

19       211.   The Code of Conduct is essentially a neutrality agreement.  The CHA signatories

20  agreed not to disparage UHW or engage in "Anti-Union activities" and UHW agreed to not to

21  disparage those signatories, i.e., no corporate campaigns.  UHW also agreed to withdraw its

22  newest ballot initiatives and the signatory hospitals and UHW agreed to jointly seek legislation to

23  address hospital pricing issues.

24       212.   The very next day, on May 6, 2014, Defendants made clear that the agreements

25  served as a stepping stone in the campaign against Prime.  Specifically, during an internal UHW

26  conference call, Dave Regan stated:

27            Now I should also say that there are some of our current employers
          who refuse to be part of this.  And I would name three in particular
28            who are on the, you know, kind of the short list of the bad actors.

1      Number one is Cedars-Sinai.  Number two is Prime Healthcare, and
       number three is Providence.  Each of those three systems refuses to
2      be part of this agreement for advocacy purposes, for code-of-
       conduct purposes, for any purpose whatsoever.  And the first thing I
3      think we got to recognize is that they now are in a clear minority of
       the industry.  They are now outliers.  And under this agreement we
4      can continue to have the right to deal with them in any way that we
       want while we try to forge this other path with everyone else.

5

6      *SEIU-UHW's Dave Regan Discusses Secret Deal with California Hospital Ass'n*, *supra*

7      paragraph 205.

8          213.   Dave Regan, acknowledging the campaign against Prime, further declared:

9      I think we have to sit down with the leadership, not just with CHA,
       but all of the major providers and say, 'Now what are we going to
10     do about Cedars, Prime and Providence?  Because you've got two
       choices.  We're going to continue to be public and to beat them up
11     and to raise all the stuff that drives you crazy, or you're going to
       figure out how to get these guys to heel.'  And—you know, so I
12     think we also now have to enlist our partners, right, who are now
       partners at a different level in saying there is just some behavior
13     that, you know, you guys are now going to interfere with our ability
       to fix Medi-Cal.  And so Prem Reddy, like, you know, how are we
14     going to deal with you?  Cedars-Sinai, et cetera, et cetera… So I
       think we should be intentional, and I think we should be direct with
15     the leadership of the industry.

16     *Id.*

17         214.   Regan also stated that:

18     It's totally fair game to go after [Prime, Cedars, and Providence].
       What we have committed, Eric [caller], is we're not going to go
19     after them in a way that captures everybody else who did—you
       know, there is plenty of ways around this.  We have plenty of things
20     we can do.  And I think what we're going to start by this is just
       making the point that these guys are now—they're just not good
21     citizens.  They are bad apples.  They are off the—you know, they
       are out of the mainstream.  They are outliers, you know, and I think,
22     again, we have to have a specific strategy for them.

23     *Id.*

24         215.   For the next few weeks, Duane Dauner, the President of CHA, worked to convince

25     Prime to sign the MOU and Code of Conduct, but Prime refused to do so.

26         216.   Subsequently, on July 3, 2014, Dauner told representatives of Prime that

27     Defendants were planning on increasing their campaign attacks against Prime.   Dauner

28     recommended that Prime at least sign the MOU so that it would be protected from the attacks,

1 and passed on the message that Defendants' campaign against Prime would continue unless Prime

2 entered into the MOU. Prime refused to do so.

3        217.    As threatened, Defendants have accelerated their campaign against Prime.

4        218.    On July 1, 2014, the President of SEIU California and Dave Regan sent a letter to

5 elected California officials asking that those officials refuse to accept political contributions from

6 "Prime Healthcare, its CEO Prem Reddy or any affiliated party." Once again, Defendants'

7 exertion of pressure on these elected officials to stop accepting campaign contributions from

8 Prime was purportedly based upon Defendants' "go-to" allegations of poor patient care at Prime

9 facilities.

10        219.    Included in the letter to California officials was the following not-so-veiled threat:

11 "Given their [Prime] extreme behavior we believe no elected leader or candidate for office can

12 take money from Prime Healthcare and expect our support as well." Christopher Cadelago,

13 *Union tells elected officials to shun hospital chain*, The Latest from Capitol Alert Blog (July 10,

14 2014, 2:04AM), http://blogs.sacbee.com/capitolalertlatest. UHW and SEIU California also

15 alerted the elected officials that they would reach out to ask their labor allies "who share our

16 values to take a similar position." Christopher Cadelago, *Union tells elected officials to shun*

17 *hospital chain*, Sacramento Bee, July 9, 2014, http://sacbee.com/2014/07/09/6545380/union-tells

18 -elected-officials.html.

19        220.    A UHW spokesman said publicly in connection with the July 1 letter to elected

20 officials: "We don't think any elected officials – Democratic or Republican – should be

21 associated with Prime Healthcare." On August 5, 2014, UHW circulated an email stating that

22 twenty California legislators, legislative candidates and political parties had pledged not to take

23 political contributions from Prime.

24 **V.    Impact of Defendants' Conduct on Prime**

25        221.    As a result of Defendants' extortionate campaign against Prime, it has been the

26 target of numerous governmental investigations, as well as private actions. The completed

27 investigations have resulted in zero finding of wrongdoing and have only confirmed the false

28 foundation upon which Defendants' repeated accusations are built.

222.     Nonetheless, Prime has incurred, and continues to incur, damages as a direct and proximate result of Defendants' extortionate scheme.  Such damages have included, by way of example, millions of dollars in expenses that Prime was forced to spend in defending itself from Defendants' attacks.  Prime also has lost customers, both current and prospective, as a direct and proximate result of Defendants' extortionate scheme.  Moreover, Prime has suffered damage to its goodwill and customer revenues after spending many years and millions of dollars cultivating that goodwill.  Defendants' actions have further caused Prime to lose business opportunities.

223.     Additionally, notwithstanding the false nature of Defendants' accusations and attacks, Defendants' conduct has damaged Prime by causing other persons and entities to advocate against it.  By way of example, in 2011, a former Prime employee filed a federal False Claims Act suit against Prime alleging that Prime was upcoding, falsifying patient diagnoses, and improperly admitting patients and, as a result, submitting false claims to Medicare and Medicaid.  The same allegations as those created in Defendants' Septicemia at Prime and Care and Coding "studies," reported by California Watch, and spread by their allies, including Sen. Hernandez.  The federal government chose not to intervene in that suit and it was made public in January 2014.

224.     Also, on June 5, 2014, relying on Defendants' publications over the Internet and otherwise, a healthcare "watchdog" coalition referred to as Our SALUD filed a Petition for a Writ of Mandate in the Superior Court for the State of California, County of Los Angeles against the Director of the California Department of Public Health requesting that the Superior Court require CDPH to suspend or revoke Prime's licenses to operate facilities within California.  Our SALUD alleges that CDPH, the statutory licensing and enforcement agency for California hospitals, has allowed Prime to operate as a "public menace" which is a "danger to patient care."  In support of this allegation, Our SALUD cites to "countless news reports, legislative inquiries, lawsuits, and government investigations," regarding Prime's practices—all of which were instituted or instigated by UHW on behalf of all Defendants.  Moreover, on August 15, 2014, dozens of SEIU members, at the direction of Defendants, joined Our SALUD members outside St. Vincent's Medical Center, one of the hospitals owned by DCHS, for the purpose of interfering with Prime's

attempted acquisition of this hospital system.

## SPECIFIC COUNTS

### COUNT I
### (18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(a) Against Each Defendant)

225.   Plaintiff Prime Healthcare Services realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

226.   Each Defendant is a RICO "person."

227.   Defendants SEIU, UHW, and CtW are RICO "enterprises," which were and are engaged in activities affecting interstate commerce at all times relevant to this Complaint.

228.   Defendants together conspired, agreed, intended, and/or adopted the goal of furthering or facilitating, the following:  that income, in the form of per capita payments, union dues, unlawful payments laundered through the LMP in violation of federal law, and other payments, resulting in increased salaries and benefits, and other financial concessions, would be received by Defendants; such income would be derived, directly or indirectly, from a pattern of activity unlawful under 18 U.S.C. § 1961(1), in which Defendants participated as principals, namely multiple, repeated and continuous acts or threats involving extortion chargeable under Cal. Pen. Code §§ 518-520 and 523-524, N.J. Stat. Ann. §§ 2C:20-5 and 2C:5-1, D.C. Code § 22-3251, and K.S.A. § 21-6501, and violations of 18 U.S.C. § 1952 *et seq.* and 29 U.S.C. § 186, in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Prime's property rights described above.

229.   An objective of Defendants' conspiracy was and is that income, or the proceeds of such income, would be used and invested in the operation of the enterprises for illegitimate purposes, including conducting the extortionate campaign against Prime and similar extortionate campaigns against others, the payment of salaries and fees to other Defendants for the purpose of engaging in future extortionate corporate campaigns, and the ongoing operation of the enterprises as described above.

230.   Defendants' activities described herein have obstructed, delayed, or otherwise affected interstate commerce.

231.    As a direct result of Defendants' racketeering activity in furtherance of their unlawful conspiracy described herein, Prime has suffered substantial injury to its business or property, including but not limited to: lost acquisitions, including of VVCH; lost patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' instigation of regulatory investigations and examinations by accreditation authorities, and loss of industry awards; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' publication and distribution of false and disparaging statements about Prime on the internet, to government officials, and to patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' sham petitioning activity; lost business goodwill and customer revenues; and the costs in time, person-hours, and other administrative or out-of-pocket expenses incurred because of Defendants' unlawful conduct described herein.

**COUNT II**
**(18 U.S.C. § 1962(d) by Conspiring To Violate § 1962(b) Against Each Defendant)**

232.    Plaintiff Prime Healthcare Services realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

233.    Each Defendant is a RICO "person."

234.    Prime is a RICO "enterprise," which was and is engaged in activities affecting interstate commerce at all times relevant to this Complaint.

235.    Defendants together conspired, agreed, intended, and/or adopted the goal of furthering or facilitating, the following: to acquire or maintain, directly or indirectly, an interest in or control of Prime through a pattern of activity unlawful under 18 U.S.C. § 1961(1), in which Defendants participated as principals, namely multiple, repeated and continuous acts or threats involving extortion chargeable under Cal. Pen. Code §§ 518-520 and 523-524, N.J. Stat. Ann. §§ 2C:20-5 and 2C:5-1, D.C. Code § 22-3251, and K.S.A. § 21-6501, and violations of 18 U.S.C. § 1952 *et seq.* and 29 U.S.C. § 186, in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Prime's property rights described above.

236.    Defendants' activities obstructed, delayed or otherwise affected interstate

commerce.

237.   As a direct result of Defendants' racketeering activity in furtherance of their unlawful conspiracy described herein, Prime has suffered substantial injury to its business or property, including but not limited to:  lost acquisitions, including of VVCH; lost patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' instigation of regulatory investigations and examinations by accreditation authorities, and loss of industry awards; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' publication and distribution of false and disparaging statements about Prime on the internet, to government officials, and to patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' sham petitioning activity; lost business goodwill and customer revenues; and the costs in time, person-hours, and other administrative or out-of-pocket expenses incurred because of Defendants' unlawful conduct described herein.

## COUNT III
### (18 U.S.C. § 1962(c) Against Defendants UHW, Change to Win, CtW Investment Group, and the Individual Defendants)

238.   Plaintiff Prime Healthcare Services realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

239.   UHW, CtW, and the Individual Defendants are each a RICO "person."

240.   SEIU is a RICO "enterprise."

241.   Each of UHW, CtW, and the Individual Defendants was and is associated with the SEIU enterprise and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the enterprise in relation to Prime through a pattern of activity unlawful under 18 U.S.C. § 1961(1), namely, multiple, repeated and continuous acts or threats involving extortion chargeable under Cal. Pen. Code §§ 518-520 and 523-524, N.J. Stat. Ann. §§ 2C:20-5 and 2C:5-1, D.C. Code § 22-3251, and K.S.A. § 21-6501, and violations of 18 U.S.C. § 1952 *et seq.* and 29 U.S.C. § 186.

242.   The activities of UHW, CtW, and the Individual Defendants obstructed, delayed, or affected interstate commerce.

243.     As a direct result of racketeering activity of UHW, CtW, and the Individual Defendants described herein, Prime has suffered substantial injury to its business or property, including but not limited to:  lost acquisitions, including of VVCH; lost patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' instigation of regulatory investigations and examinations by accreditation authorities, and loss of industry awards; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' publication and distribution of false and disparaging statements about Prime on the internet, to government officials, and to patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' sham petitioning activity; lost business goodwill and customer revenues; and the costs in time, person-hours, and other administrative or out-of-pocket expenses incurred because of Defendants' unlawful conduct described herein.

**COUNT IV**
**(18 U.S.C. § 1962(c) Against Defendants SEIU, Change to Win, CtW Investment Group, and the Individual Defendants)**

244.     Plaintiff Prime Healthcare Services realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

245.     SEIU, CtW, and the Individual Defendants are each a RICO "person."

246.     UHW is a RICO "enterprise."

247.     Each of SEIU, CtW, and the Individual Defendants was and is associated with the UHW enterprise and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the enterprise in relation to Prime through a pattern of activity unlawful under 18 U.S.C. § 1961(1), namely, multiple, repeated and continuous acts or threats involving extortion, chargeable under Cal. Pen. Code §§ 518-520 and 523-524, N.J. Stat. Ann. §§ 2C:20-5 and 2C:5-1, D.C. Code § 22-3251, and K.S.A. § 21-6501, and violations of 18 U.S.C. § 1952 *et seq.* and 29 U.S.C. § 186.

248.     The activities of SEIU, CtW, and the Individual Defendants obstructed, delayed, or affected interstate commerce.

249.     As a direct result of the racketeering activity of SEIU, CtW, and the Individual

1  Defendants described herein, Prime has suffered substantial injury to its business or property,

2  including but not limited to:  lost acquisitions, including of VVCH; lost patients; legal fees,

3  public relations expenses, and other costs incurred because of, and in response to, Defendants'

4  instigation of regulatory investigations and examinations by accreditation authorities, and loss of

5  industry awards; legal fees, public relations expenses, and other costs incurred because of, and in

6  response to, Defendants' publication and distribution of false and disparaging statements about

7  Prime on the internet, to government officials, and to patients; legal fees, public relations

8  expenses, and other costs incurred because of, and in response to, Defendants' sham petitioning

9  activity; lost business goodwill and customer revenues; and the costs in time, person-hours, and

10  other administrative or out-of-pocket expenses incurred because of Defendants' unlawful conduct

11  described herein.

12                           **COUNT V**
                  **(18 U.S.C. § 1962(c) Against Each Defendant)**

13

14       250.    Plaintiff Prime Healthcare Services realleges and incorporates by reference the

15  allegations contained in the preceding paragraphs as if fully set forth herein.

16       251.    Each Defendant is a RICO "person."

17       252.    The RICO "enterprise" was and is an association-in-fact enterprise consisting of

18  SEIU, UHW, CtW, and the Individual Defendants.

19       253.    Each of the Defendants was and is associated in this enterprise and has conducted

20  or participated, directly or indirectly, in the management and operation of the affairs of the

21  enterprise in relation to Prime through a pattern of activity unlawful under 18 U.S.C. § 1961(1),

22  namely, multiple, repeated and continuous acts or threats involving extortion, chargeable under

23  Cal. Pen. Code §§ 518-520 and 523-524, N.J. Stat. Ann. §§ 2C:20-5 and 2C:5-1, D.C. Code § 22-

24  3251, and K.S.A. § 21-6501, and violations of 18 U.S.C. § 1952 *et seq.* and 29 U.S.C. § 186.

25       254.    Defendants' activities obstructed, delayed, or affected interstate commerce.

26       255.    As a direct result of Defendants' racketeering activity described herein, Prime has

27  suffered substantial injury to its business or property, including but not limited to:   lost

28  acquisitions, including of VVCH; lost patients; legal fees, public relations expenses, and other

costs incurred because of, and in response to, Defendants' instigation of regulatory investigations and examinations by accreditation authorities, and loss of industry awards; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' publication and distribution of false and disparaging statements about Prime on the internet, to government officials, and to patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' sham petitioning activity; lost business goodwill and customer revenues; and the costs in time, person-hours, and other administrative or out-of-pocket expenses incurred because of Defendants' unlawful conduct described herein.

**COUNT VI**

**(18 U.S.C. § 1962(d) by Conspiring To Violate § 1962(c) Against Defendants UHW, Change to Win, CtW Investment Group, and the Individual Defendants)**

256.    Plaintiff Prime Healthcare Services realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

257.    UHW, CtW, and the Individual Defendants are each a RICO "person."

258.    SEIU is a RICO "enterprise."

259.    Each of UHW, CtW, and the Individual Defendants was and is associated with the SEIU enterprise, and has conspired, agreed, intended, and/or adopted the goal of furthering or facilitating, the following: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the enterprise in relation to Prime through a pattern of activity unlawful under 18 U.S.C. § 1961(1), namely, multiple, repeated and continuous acts or threats involving extortion, chargeable under Cal. Pen. Code §§ 518-520 and 523-524, N.J. Stat. Ann. §§ 2C:20-5 and 2C:5-1, D.C. Code § 22-3251, and K.S.A. § 21-6501, and violations of 18 U.S.C. § 1952 *et seq.* and 29 U.S.C. § 186, in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Prime's property rights described above.

260.    The activities of UHW, CtW, and the Individual Defendants obstructed, delayed, or affected interstate commerce.

261.    As a direct result of the racketeering activity of UHW, CtW, and the Individual Defendants in furtherance of their unlawful conspiracy described herein, Prime has suffered

substantial injury to its business or property, including but not limited to: lost acquisitions, including of VVCH; lost patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' instigation of regulatory investigations and examinations by accreditation authorities, and loss of industry awards; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' publication and distribution of false and disparaging statements about Prime on the internet, to government officials, and to patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' sham petitioning activity; lost business goodwill and customer revenues; and the costs in time, person-hours, and other administrative or out-of-pocket expenses incurred because of Defendants' unlawful conduct described herein.

**COUNT VII**

**(18 U.S.C. § 1962(d) by Conspiring To Violate § 1962(c) Against Defendants SEIU, Change to Win, CtW Investment, and the Individual Defendants)**

262.    Plaintiff Prime Healthcare Services realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

263.    SEIU, CtW, and the Individual Defendants are each a RICO "person."

264.    UHW is a RICO "enterprise."

265.    Each of SEIU, CtW, and the Individual Defendants was and is associated with the UHW enterprise, and has conspired, agreed, intended, and/or adopted the goal of furthering or facilitating, the following: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the enterprise in relation to Prime through a pattern of activity unlawful under 18 U.S.C. § 1961(1), namely, multiple, repeated and continuous acts or threats involving extortion, chargeable under Cal. Pen. Code §§ 518-520 and 523-524, N.J. Stat. Ann. §§ 2C:20-5 and 2C:5-1, D.C. Code § 22-3251, and K.S.A. § 21-6501, and violations of 18 U.S.C. § 1952 *et seq.* and 29 U.S.C. § 186, in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Prime's property rights described above.

266.    The activities of SEIU, CtW, and the Individual Defendants obstructed, delayed, or affected interstate commerce.

267.    As a direct result of the racketeering activity of SEIU, CtW, and the Individual Defendants in furtherance of their unlawful conspiracy described herein, Prime has suffered substantial injury to its business or property, including but not limited to:  lost acquisitions, including of VVCH; lost patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' instigation of regulatory investigations and examinations by accreditation authorities, and loss of industry awards; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' publication and distribution of false and disparaging statements about Prime on the internet, to government officials, and to patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' sham petitioning activity; lost business goodwill and customer revenues; and the costs in time, person-hours, and other administrative or out-of-pocket expenses incurred because of Defendants' unlawful conduct described herein.

## COUNT VIII
### (18 U.S.C. § 1962(d) by Conspiring To Violate § 1962(c) Against Each Defendant)

268.    Plaintiff Prime Healthcare Services realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

269.    Each Defendant is a RICO "person."

270.    The RICO enterprise was and is an association-in-fact enterprise consisting of SEIU, UHW, CtW, and the Individual Defendants.

271.    Each of the Defendants was and is associated with this enterprise, and has conspired, agreed, intended, and/or adopted the goal of furthering or facilitating, the following: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the enterprise in relation to Prime through a pattern of activity unlawful under 18 U.S.C. § 1961(1), namely, multiple, repeated and continuous acts or threats involving extortion, chargeable under Cal. Pen. Code §§ 518-520 and 523-524, N.J. Stat. Ann. §§ 2C:20-5 and 2C:5-1, D.C. Code § 22-3251, and K.S.A. § 21-6501, and violations of 18 U.S.C. § 1952 *et seq.* and 29 U.S.C. § 186, in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Prime's property rights described above.

272.   Defendants' activities obstructed, delayed, or affected interstate commerce.

273.   As a direct result of Defendants' racketeering activity in furtherance of their unlawful conspiracy described herein, Prime has suffered substantial injury to its business or property, including but not limited to:  lost acquisitions, including of VVCH; lost patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' instigation of regulatory investigations and examinations by accreditation authorities, and loss of industry awards; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' publication and distribution of false and disparaging statements about Prime on the internet, to government officials, and to patients; legal fees, public relations expenses, and other costs incurred because of, and in response to, Defendants' sham petitioning activity; lost business goodwill and customer revenues; and the costs in time, person-hours, and other administrative or out-of-pocket expenses incurred because of Defendants' unlawful conduct described herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Prime Healthcare Services, Inc. prays for judgment against Defendants, and each of them jointly and severally, as follows:

1.   For general damages, the exact amount to be determined at trial, to compensate Prime Healthcare Services for the harm caused by Defendants' unlawful conduct;

2.   For trebling of Prime Healthcare Services' damages;

3.   For Prime Healthcare Services' reasonable attorneys' fees and costs incurred in connection with this action; and

4.   For such other legal and equitable relief as this Court deems just and proper, including disgorgement by Defendants of all sums obtained pursuant to the scheme described herein.

DLA Piper LLP (US)
San Francisco

-68-

COMPLAINT

1

## JURY DEMAND

2      Plaintiff Prime Healthcare Services, Inc. hereby demands a trial by jury for each and every

3  one of the foregoing claims for relief so triable.

4

5  Dated:  August 25, 2014                          DLA PIPER LLP (US)

6

7                                                   By: /s/ Kathleen S. Kizer
                                                        Kathleen S. Kizer

8                                                   (Pending applications *pro hac vice*)
9                                                   Edward Scheideman
                                                    edward.scheideman@dlapiper.com
                                                    Victoria A. Bruno
10                                                  victoria.bruno@dlapiper.com
                                                    500 Eighth Street, NW
11                                                  Washington, D.C. 20004
                                                    Telephone:    202.799.4000
12                                                  Facsimile:    202.799.5000

13                                                  Attorneys for Plaintiff
                                                    PRIME HEALTHCARE SERVICES, INC.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28